FRED EVERS, Appellant, v. A. E. WEBB et al., Appellees.

DEEDS: Validity—Mental Incompetency. Mere proof of a mental
1   defect does not necessarily establish incompetency to make a
    deed, and to invalidate a deed it must be shown that the
    mental deterioration of the grantor had reached a stage where
    he was incapable of fairly comprehending the nature and effect
    of his act.

DEEDS: Cancellation or Setting Aside—Undue Influence. Evidence
2   reviewed, in an action to quiet title as against a deed by a
    grantor to his granddaughter, in consideration of support and
    maintenance, and held insufficient to show undue influence.

EVIDENCE: Burden of Proof—Mental Incompetency—Presump-
3   tion. In an action to set aside a deed for mental incompetency,
    the presumption is that the grantors were sane, and the burden
    is upon the one seeking to set aside the deed, to overcome that
    presumption.

DEEDS: Cancellation or Setting Aside—Mental Incompetency. Evi-
4   dence reviewed, in an action to set aside a deed on the ground
    of incompetency, and held insufficient to show that the grantor
    was incompetent at the time of the execution of the deed.

*Appeal from Sac District Court.*—M. E. HUTCHISON, Judge.

JULY 10, 1919.

ACTION in equity to establish and quiet plaintiff's claim
of title to a half interest in 160 acres of land. The defend-
ants deny plaintiff's claim to the ownership of any part or
interest in the property. Trial to the court, petition dis-
missed, and plaintiff appeals.—*Affirmed.*

*Malcolm Currie, R. F. Mitchell,* and *Kenyon, Kelleher,
Price & Hanson,* for appellant.

*W. A. Helsell,* for appellees.

WEAVER, J.—In the year 1913, Henry Evers and his
wife, Margaret, were residents of Sac City, Iowa. They

were natives of Germany, and on the date named, were
about 85 years old. They had come to the United States in
their early married life, and for many years had lived in
Sac County. Two children had been born to them, a son,
Fred Evers, the plaintiff herein, who, at the time of the trial
below, was 65 years old, and had been for 30 years a mar-
ried man, living upon a farm of his own, and a daughter,
Emma, who died in 1889, leaving an infant daughter, who
was taken into the home of her grandparents, Henry Evers
and wife. Later, Minnie married one Heilig, and is one of
the defendants herein. Henry Evers owned a farm of 160
acres, on which he and his wife lived until old age forced
them to relinquish its personal care, when they moved to
Sac City. In 1909, Minnie, with her husband, removed to
South Dakota. On June 3, 1913, the old gentleman appears
to have suffered a stroke or attack, the exact nature of
which is not explained, but the initial effect or manifestation
of it was shown in resulting physical weakness and inter-
ference with his power of speech. As to his mental con-
dition, we will speak later. His son, - the plaintiff, and
granddaughter, Mrs. Heilig, were called, and both came;
and, after some consultation between them, and perhaps
with the physician and friends, as to the needs of the sit-
uation, it was agreed that Mrs. Heilig would remain, for a
time at least, and care for the old people; and the plain-
tiff returned to his home. About this time, proceedings
were begun, on application of the son, to place the father
under guardianship. One Humphries, a neighbor, was ap-
pointed temporary guardian, but the matter appears not to
have progressed further, and the appointment was never
made permanent; and Humphries was discharged, and the
proceedings were dismissed, October 13, 1913, on motion of
the plaintiff. Though he remained weak, Mr. Evers seemed
to improve, and within a few days after June 3, 1913, was
able to get around, and go out of doors, and recovered, in

some degree, his power of speech. On June 24, 1913, a written contract was executed between Henry Evers and wife and their granddaughter, Mrs. Heilig, as follows:

"This agreement, made and entered into this 24th day of June, 1913, by and between Henry Evers and Margaret Evers, husband and wife, of Sac City, Iowa, parties of the first part, and Minnie Margaret Heilig, party of the second part, witnesseth:

"Whereas the parties of the first part are advanced in years and feeble in body and will need the care and attention and services of someone competent and willing to care for them during the declining years of their lives and look after their physical wants and comforts;

"And whereas, the second party, who is a granddaughter of the parties of the first part, has agreed upon the request and solicitation of the parties of the first part to render the said parties of the first part such services in the way of care and attention as they shall need during the remainder of their natural lives and the survivor of them.

"Now, therefore, in consideration of the premises, the parties of the first part hereby agree to convey unto the party of the second part the following described real estate, situated in the county of Sac and state of Iowa, to wit:

"The Northwest quarter (NW¼) of Section twenty-seven (27) in Township eighty-nine (89) North, Range thirty-five (35) West of the 5th P. M., and to execute unto the said party of the second part a conveyance of said premises subject only to a lease of the same to the present tenant.

"And the party of the second part hereby expressly agrees, in consideration of said conveyance, that she will render such services to the parties of the first part during the remaining years of their lives and each of them as the said first parties or either of them may need, and she will care for them and look after all their wants and physical comforts during all of such times.

"Henry X̲ Evers,
<small>his</small>
<small>mark</small>

"Margaret X̲ Evers, ·
<small>her</small>
<small>mark</small>

"Minnie Margaret Heilig.

"Witnesses:

"Z. Fuller,

"Orville Lee."

On the same date, Henry Evers and wife united in executing and delivering to Mrs. Heilig a deed with the usual covenants of warranty for the 160 acres of land owned by them. The recited consideration for the deed is, "the love and affection we bear our granddaughter," and an "agreement on part of our granddaughter, Minnie Margaret Heilig, that she will render to us such service as we may need during our declining years and care for our physical wants and comforts during the remaining years of our lives and of each of us, which agreement is of even date herewith and is in writing."

The deed was recorded on the day following its date. On the same day, also, Margaret Evers, wife of Henry, as to whose mental competency no question is raised, made and executed a will, by which she made her granddaughter, Mrs. Heilig, the sole beneficiary of all the estate of which said testatrix should die seized or possessed.

Three days later, June 27, 1913, Mrs. Heilig, accompanied by both her grandparents, returned to her home in South Dakota, where she kept and cared for them during the remainder of their lives. On October 6, 1914, Mrs. Heilig sold and conveyed the farm to the defendant A. E. Webb, both her grandparents, Henry Evers and Margaret Evers, and her husband, John Heilig, joining in making such conveyance by warranty deed.

Henry Evers died June 11, 1915, and his wife, Margaret, died on December 6th of the same year. Their bodies

were by Mrs. Heilig brought back to Sac City, where they were buried, she bearing the expenses so incurred.

To complete this outline of matters not in serious dispute, it should also be said that, in the year 1909, four years prior to the conveyance made by him to his granddaughter, Henry Evers executed a will, by which he gave and devised to his wife a life estate in all his property. in lieu of dower, subject to which he gave and devised all his property and estate to Fred Evers and Minnie Heilig, share and share alike.

On November 6, 1916, this action was begun by Fred Evers, to set aside and declare void the deed made by his father and mother to their granddaughter, and the deed made by Mrs. Heilig and her grandparents to the defendant Webb; also, that he be decreed to be the owner of an undivided half of the quarter section, and that a partition thereof be made, and for general relief.

In support of his demand, he alleges that, at the date of the first-named deed, June 24, 1913, Henry Evers was wholly incompetent to make such conveyance; that he was then suffering from senile dementia, and wholly unable to understand or comprehend the nature and effect of his act or the papers executed by him; and that such instruments are, therefore, void. He further alleges that such contract and conveyance were made without consideration, and were procured by Mrs. Heilig by undue influence exercised over said grantor by herself and others acting in her behalf.

As to the defendant Webb, the plaintiff charges that he took title to the land with notice and knowledge of the alleged defect in the title of Mrs. Heilig, and still withholds a large part of the agreed consideration, to await the ultimate determination or adjudication of the plaintiff's claim to a share in the land.

By an amendment, plaintiff pleads the relationship between Mrs. Heilig and her grandparents, and alleges that,

at the date of the deed, there was a relation of special trust and confidence between them, a relation which she abused and took advantage of, to poison the minds of her grandparents toward their son.

The defendants admit the execution and delivery of the deeds sought to be set aside, and deny all charges of fraud and undue influence in their procurement. They also plead the contract of June 24, 1913, hereinbefore set out, and allege that the same was fully and in good faith performed and carried out by Mrs. Heilig and her husband, thereby rendering good and sufficient consideration for the conveyance of the land to her. They also deny the allegation of mental unsoundness made against Henry Evers, or that he was in any wise incompetent to make the deed.

The trial court, after hearing the testimony of numerous witnesses, offered on either side, found against plaintiff, and embodied in its decree a finding that, on the date of the contract and deed, Henry Evers had sufficient mental capacity to legally execute those instruments; that, after the stroke or attack from which he suffered on June 3, 1913, he had recovered or improved in a material degree before June 24th; that he knew the act in which he was engaged; knew the members of his family and those who were the natural recipients of his bounty; knew the property he possessed; and had a well-defined judgment how he wished to dispose of the same. The court concedes that the truth of these findings, or of some of them, is in dispute, but, in its opinion, the decided preponderance is with the views expressed and the conclusion announced.

Counsel on both sides agree that the case thus stated involves, for the most part, only familiar and well-established principles of law and equity, and that, for the plaintiff to establish any right or interest in the 160 acres, it must be found from the evidence, as a matter of fact, either (1) that the deed was obtained through undue influ-

ence exercised over the grantor by the grantee, or by others acting in her behalf, or (2) that, at the time the deed was executed, the grantor, Henry Evers, was so far demented that he could not and did not understand or comprehend, to a reasonable degree, the nature and effect of his act.

It is a quite constant feature of cases of this kind that but little effort is required to find plenty of witnesses who have seen some sign of deterioration in a person whose mental soundness is questioned, and this is especially true where the alleged unsoundness bears the taking title of senile dementia; while, on the other hand, there is usually no lack in the number who knew the alleged dement well, and are equally certain that his mental vigor and soundness were not materially abated. This conflict arises not so much from recklessness of witnesses, as from the varying conception they have of what constitutes mental unsoundness, for the purposes of the law.

There is, perhaps, no other fact issue on which the courts feel more free to reject opinions of witnesses and verdicts of juries than those which turn upon this question.

1. DEEDS: validity: mental incompetency.

It is well settled, contrary to the opinion of many persons, that mere proof of a mental defect does not necessarily establish incompetency. To repeat the language of this court in *Elwood v. O'Brien,* 105 Iowa 239, 240, speaking of a party to a contract, we said:

"The presumption is, he was sane when the contract was made, and the burden is upon appellants to show that he was not, and that he was, in fact, incapacitated from making the contract. In order to avoid the contract, it must appear not only that defendant was unsound of mind or insane, when it was made, but that this unsoundness or insanity was of such character that he had no reasonable perception or understanding of the nature and terms of the contract. Mere weakness of mind or unsoundness to some

degree is not sufficient, in the absence of fraud or undue influence, to invalidate a contract."

This rule has been too often stated and too often approved to justify us in taking time and space for a review of the authorities.

If, therefore, we concede, as is proper under the record, that plaintiff did produce evidence on the trial fairly tending to show that, at and about the time this deed was made, the mind of Henry Evers was, to some degree, weakened and clouded by illness or by senile decay, it does not follow that the conveyance ought to be set aside. That result can be justified only by the further finding that the mental deterioration of the grantor had reached a stage where he was incapable of fairly comprehending the nature and effect of his act. For if, notwithstanding his mental weakness, if any, he still had sufficient capacity to know and understand, and did, in fact, know and understand the nature and effect of the contract and deed made by him, it is not within the province of the court to set them aside. It is not a question whether what he did was reasonable or unreasonable, just or unjust, or whether the disposition made of his property was one which the court or any other person would have made under the circumstances. It was his legal right to divide the property between his heirs, or give it all to one or to neither, or to convey it in consideration of an assured support for himself and his aged wife during the remainder of their lives; and such act on his part is not to be nullified except by an affirmative showing of mental incapacity which had progressed to the extent above indicated. Whether that stage of imbecility had been reached by Henry Evers was, under the evidence, a fair question of fact for the decision of the trial court, and that question the court solved against the contention of the appellant.

Is the record such that, upon its consideration *de novo*,

we ought to say that the trial court was mistaken in its conclusion?

I. The allegation in the petition that the contract and deed were procured by undue influence, exercised by Mrs. Heilig and others, is, we think, wholly without support in the testimony. The charge in this respect appears to have no other foundation than is inferred or suspected from the fact that, during the period from June 3 to June 24, 1913, Mrs. Heilig was staying with and caring for her grandparents, and had the opportunity, if she so desired, to exercise what influence, if any, she had over them, or to excite in them a disposition to prefer her in disposing of their property. There is no evidence of any kind or from any person that she did demand or request them to enter into the contract or to make the deed, or that she brought to bear upon them, directly or indirectly, any pressure or duress, either moral or physical, for that purpose. We may add in this connection that the suggestion in the petition that there is a presumption of undue influence because of confidential relations between the parties is not urged in argument, and has no support in the record.

2. DEEDS: cancellation or setting aside: undue influence.

II. Coming again to the question of the actual mental condition of Henry Evers, and whether he is clearly and satisfactorily shown to have been incompetent to make the contract and deed, we are well satisfied that the negative finding upon this inquiry by the trial court must be upheld. At the outset of such inquiry, the court was required to give the appellees the benefit of the presumption that both Evers and his wife were sane, and that their contract and deed were their voluntary and intelligent act. The burden was and is upon the appellant to overcome that presumption. Looking to the testimony offered in chief,

3. EVIDENCE: burden of proof: mental incompetency: presumption.

and relied upon to satisfy this rule as to burden of proof, we find the showing to be that, after these old people took up their home in Sac City, they lived alone. They employed no help, the wife attending to the duties of the household. As the decrepitude of advanced age grew upon them, their home was ill kept, untidy, and unsanitary. The old gentleman, because blind or nearly so, and unable to give personal attention to the leasing of his farm, depended on his wife, son, and a neighboring attorney for assistance. But, prior to June 3, 1913, there is little or no evidence on which to base a doubt that he retained a sufficient degree of mentality to transact the ordinary, simple business to which he had always been accustomed, although his physical infirmities compelled him to rely upon others to some extent.

4. DEEDS: cancellation or setting aside: mental incompetency.

On this date last named, as we have before stated, he suffered a stroke or attack which rendered him, for a short time, speechless, and physically weak. It also fairly appears that he was mentally confused, and the physician called in expressed the idea that he had become insane, and there was talk of taking him to the hospital, which was abandoned when Mrs. Heilig came, and consented to remain and take care of the old people. The plaintiff, who lived ten miles away, and reached his parents in the afternoon of that day, says his father did not recognize him, and was unable to speak intelligently, except, sometimes, to answer yes or no to questions asked him. He wandered about aimlessly; used words or expressions of no apparent meaning; mumbled to himself; was liable to fall down, if not watched and assisted; tried to smoke, and did not seem to know which end of the pipe to put in his mouth. The next morning, he seemed a little better, and was able to dress himself with little help.

Plaintiff left for his own home on the morning of June

5th, and had not returned to see his parents before the contract and deed in suit were made, on June 24th. Aside from the plaintiff and the physician, the only witnesses offered by him of the mental condition of his father on June 3d, and for a day or two after, are Mrs. Slacks and Mr. Humphries, who were callers at the home at that time; and they corroborate plaintiff's statements, in most respects. Except the testimony of Dr. Fuller that he saw Henry Evers on June 29th, and discovered no material change in him, all the witnesses who saw him during June, and after the attack occurring on the 3d of that month, unite in saying that he recovered, to a considerable degree, and showed no evidence of mental unsoundness. Five different neighbors and acquaintances saw him during that period, and express the opinion that he was of sound mind. The two witnesses to the execution of the contract and deed, one of them a physician, express the same opinion. Mr. Jackson, an experienced attorney at law, who drew the papers, says he was first told by Mrs. Heilig that they had come to an understanding or agreement and desired his assistance, and thereupon the witness called on the old gentleman, and talked the matter over with him. To the attorney's inquiry whether he wanted to put his wishes into a will, or make a present conveyance, Evers said they were going to give her the farm; wanted to give it to her now; wanted to make a deed. The witness having put the contract and deed in form, they were then executed by the parties, and, after they were read over to him, Evers signed them by his mark. The witness further says that, in his judgment, Evers was then of sound mind.

Except a Mr. Lamoreux, no witness who saw him between the date of the deed to Mrs. Heilig and his death, suggests any doubt of his soundness of mind; but all, some five or six in number, thought him competent. Now, in order to entitle plaintiff to the relief asked, it must also be

shown, by a preponderance of the evidence, that Henry Evers was of unsound mind on October 6, 1914, when he united with Mr. and Mrs. Heilig in conveying the land to the defendant Webb; and, aside from the expert testimony to which we shall soon refer, the record is without evidence of any kind to support such a finding.

The presumption of his mental soundness at that time is also strengthened by the testimony of the notary who prepared the deed, witnessed Evers' signature, and took his acknowledgment, as it is also by the other witnesses living in Dakota at the time, and there meeting and knowing said grantor. Taking the testimony of all the nonexpert witnesses on either side, and giving them all due credit for candor and good faith, it must be said that it fairly preponderates in favor of the theory that, on June 24, 1913, and on October 6, 1914, Henry Evers was possessed of sufficient mental capacity to make a valid contract and deed.

Large reliance is placed by appellant upon the expert testimony of Doctors Findley, Studebaker, and McCreight. The first named, Dr. Findley, alone attempts to speak of Evers from personal observation, and his judgment, founded thereon, is entitled to respectful consideration; but the question still remains one upon which the court was required to reach its own conclusion from the evidence as a whole. The doctor's professional attendance on the old man was limited to two visits on June 3d, and one visit on June 4th; and, in view of later developments, and the testimony of the many witnesses who saw the patient at different times during the remaining two and a half years of his life, the conclusion is justified that there was a mistake in this physician's diagnosis of a confirmed, hopeless condition of senile dementia, from which there was no possibility of recovery or improvement.

The other physicians, having answered as to their general qualifications to speak as experts, were each asked to

answer a hypothetical interrogatory, framed by counsel. It consists of a statement of assumed facts, filling six large, closely printed pages. It embodies several hundred clauses, and an almost infinite variety of alleged circumstances, and concludes with the inquiry:

"Now, Doctor, assuming the facts to be as I stated, basing your answer upon your knowledge, observation, and experience as a physician and surgeon, are you able to express an opinion as to the mentality or mental condition of the person or patient I have referred to?"

An affirmative answer having been obtained, it is followed with the question whether a person such as there described is of sound or unsound mind, to which the witness responds that such a person is a victim of senile dementia, which is a permanent and progressive ailment.

Without at all reflecting upon counsel in their manner or method of presenting their testimony, it is proper to say that it is a real misfortune that, in the trial of nearly every case involving questions of mental condition, the idea seems to prevail that the weight and value of expert testimony is in proportion to the length and perplexity of the interrogatory by which it is extracted from the witness; when, in truth, the very multiplicity of detail and the piling up of item on item, many of them being, as a matter of common knowledge, wholly consistent with perfect soundness of mind, and many others having no fair basis in the testimony, tend only to detract from the weight and value of the witness' opinion, when the court or jury comes to consider the merits of the issue to be decided. Evidence that an old man's eyesight is dim, his hearing impaired, his hand unsteady, his voice tremulous, his joints rheumatic, his step shortened, and so on through all the long list of unwelcome signals of the approaching end of his earthly career, may all be true; and yet the divine spark, the immortal mind, may still shine with undimmed radiance until it lights

him through the gateway of death; or, even if it fade as the end draws near, the law will still guard his right to do what he will with his own until the darkness is so com-plete as to deprive him of reason and judgment. It is, therefore, incumbent upon the court, in considering expert evidence based solely on a hypothetical question framed by a litigant, to examine it with care, and to give the answers greater or less weight, according as the hypothetical statement does or does not conform to the well-proved facts.

Applying that test, we have no hesitancy in saying that the deficiency we have before pointed out in the plaintiff's proofs of the alleged mental incapacity of Henry Evers by nonexpert testimony is not bridged over or supplied by the testimony of the physicians. The evidence of these experts may. be conceded to be the accepted, scientific view of the profession, based on the assumption of the entire correctness of the hypothesis on which their opinion is formed; but it manifestly proves too much for the plaintiff's case. They agree that a man in the condition described in that statement is in an advanced stage of senile dementia, and that such condition is always progressive and incurable. Now, with a single exception, the record shows, by every one of the numerous witnesses who saw or knew Henry Evers during the two and a half years of his life after June 5, 1913, that he did improve to such an extent that he impressed them all with the belief that he was a man of sound mind. We cannot discard all this concurring testimony as false or mistaken. It is far easier and more reasonable to conclude that he was not a senile dement, as, indeed, he could not have been if we are to accept the opinion of all the medical witnesses as to the nature of such a condition.

There is still another aspect of the case to which we may well advert. It is argued that it was an unnatural thing for this old man and his wife to convey the farm to their granddaughter alone, leaving no substantial estate to

their son. But the record is not devoid of matters which go far to explain their act. As we have seen, there were but two children of their union, Fred, the plaintiff, and a daughter, Emma, who died in 1889, leaving an infant child, Minnie, then but a few days old. That infant they took into their home and reared to womanhood. To the affection which they gave her as the child of their deceased daughter, there was naturally added the perhaps still warmer regard bestowed upon her as a member of their own immediate family. She married, but had returned to visit them from time to time; and, when the grandfather was stricken with sickness, she came to them and assumed their care. She had no property of her own. Fred, more than 60 years old, had, for 30 years, been established in a home of his own. He owned 240 acres of land, which had been deeded to him by his father for a consideration of "one dollar and parental affection." So far as appears, the girl's mother, Emma, had never received any property or bounty at the hands of her father; and if, under these circumstances, Evers and his wife felt or believed that a deed of the farm of 160 acres to the granddaughter, upon her contract to keep, maintain, and care for them for the rest of their lives, was a just and fair method of evening up the family fortunes, it was a conclusion which had some measure of reason and justification. At least, it was not so unreasonable as to suggest any lack of mental capacity on the part of the grantors.

It is to be kept in mind, too, that there is nowhere in the record any suggestion that the wife of Henry Evers was lacking in mental capacity. As the wife of Henry, the mother of Fred, and grandmother of Minnie, and a woman presumably of normal mind and character, she must have been as nearly impartial in her affections for these persons as it is humanly possible to be; and the fact that she freely united with her husband in making the contract and deed to Minnie, is evidence of no small value that she be-

lieved it to be right, and that she would not have permitted that disposition of the property had she believed that, equitably, Fred was entitled to share in it. There is no evidence, nor does there seem to be any claim, that she was subjected to any undue influence, and her voluntary acquiescence in and consent to the contract and conveyances are not without bearing upon the good faith of the transaction.

There is some evidence that Henry was angry at Fred for attempting to put him under guardianship, and it is possible that that fact may have had some influence over his mind. But even if this be so, it tends more to show that the old gentleman still retained the normal qualities of the average man than to indicate any failure of mental capacity.

There is no occasion for further discussion. The finding of the trial court that the allegation of mental incapacity on part of Henry Evers to make the conveyances sought to be set aside has not been sustained by sufficient proof, is affirmed. The repeated criticism of the trial court, indulged in by counsel for appellant, to the general effect that its attitude and rulings on the trial were unfair, or influenced by undue sympathy for the principal appellee, is not justified by anything in the record.

The decree below is right, and it is—*Affirmed*.

LADD, C. J., GAYNOR and STEVENS, JJ., concur.