IN RE WILL OF MARY BEHREND.

WM. (OR WILL) BEHREND, Proponent, v. CARL BEHREND, Contestant.

No. 44899.

FEBRUARY 13, 1940.

Hagemann, Hagemann & Hagemann, for proponent, appellee.

Sweet & Sager and Sullivan & Scholz, for contestant, appellant.

OLIVER, J.—This action involves the admission to probate of an instrument executed November 5, 1935, as the will of Mary Behrend who died February 17, 1937, aged 76 years. In 1910, testatrix and her husband, Louis Behrend, had moved from their farm to the town of Tripoli, Iowa. They deeded a farm near Tripoli to each of their two children, appellee, Will, and appellant, Carl, who have since occupied the same. Under the arrangement each son agreed to pay the parents, or surviving parent, an annuity or rental of $250 per year. Louis Behrend died in 1931, leaving his property consisting of the home in Tripoli and $6,700 in certificates of deposit to testatrix, Mary Behrend. Mrs. Behrend continued to occupy the home until her death, apparently living alone.

The sons were not upon friendly terms with each other. Carl and his wife testified to a controversy between them in the presence of Mary Behrend at the time the Louis Behrend will was opened, in which Will said, "That is all you are going to get from that. I will get all the rest of it." To this Carl replied, "That all depends. After this everything is going to be black and white. We are going to have a guardian appointed and you will pay your rent as good as I do."

Carl then talked with his mother about a guardian for her and shortly thereafter had his attorneys prepare such an application for Mary Behrend to sign. A Mr. Fink called upon Mrs.

Behrend to secure her signature and Carl and his wife testified Mrs. Behrend then asked Mr. Fink to act as her guardian, saying she couldn't attend to that stuff and he should do that for her. However, Fink declined to act as guardian. Carl sent several other persons to talk to Mrs. Behrend about a guardian but apparently she refused to sign any application. On August 26, 1931, Carl petitioned for the appointment of a guardian for Mrs. Behrend, alleging she was inexperienced in business, was afflicted with a goiter which affected her sensory system, and with senility attendant with old age, resulting in mental debility so as to make her irrational, possessed of delusions, incapable of exercising discretion and managing her affairs, and that she was guided by the will of others and had no will of her own. At the same time Carl filed objections to the appointment of Mrs. Behrend as executrix of her husband's estate, based upon similar allegations. The appointment of a guardian was resisted and the petition was afterwards dismissed by Carl. In September 1931 she was appointed executrix of her husband's estate which was closed in 1932.

In December 1933 Carl filed a second petition for the appointment of a guardian for his mother, containing averments like those of the former application. This petition was also dismissed, apparently upon the suggestion of Dr. Borchert who told Mrs. Behrend she was too sick to go through a contest and that he would tell Carl her condition was not strong enough and she wouldn't stand it. He told her, "You don't need a guardian. I will tell Carl to drop the procedure." In this conversation she told the doctor, "Will is taking care of my business and I don't need a guardian."

A witness testified that in the spring of 1935, Mrs. Behrend said, "She had two farms and they gave them to Carl and Will and the rest she wanted to keep while she lives and then they could have it like another one." The witness said, "She talked pretty well."

Carl's wife testified that after the death of Louis Behrend, Carl and she visited Mrs. Behrend about twice a month until the last few years before her death and that after that they didn't dare go because they were afraid of Will—"He always looked so mad at us we didn't dare go." Carl testified, "The relations between me and my mother was friendly."

Dr. Herman F. Borchert lived near Mrs. Behrend and attended her between 1926, and her death, except during 1934 and 1935. He saw her occasionally upon the street during 1934 and 1935. In the fall of 1935 he talked to her. He testified, "She didn't recognize me at first. Then I asked her, 'How are you? How are you getting along?' 'Not very good', she says. And I says, 'Why?' 'Well', she says, 'Will took me to other doctors and it seems so that I am not getting along very good but Will is helping me take care of my property and I don't want to get into trouble. I want to come back to you but it seems as though they don't want to have me come back to you.'"

The will of Mrs. Behrend was dated November 5, 1935. At that time she was 75 years old. Will took his mother from Tripoli to the lawyer's office in Waverly. Mrs. Behrend was alone in the office with the lawyer and the witnesses who signed at her request when the will was executed. It provided (1) for the payment of debts, (2) Carl was given $25 and the annuity or rent due from him on his farm since 1932, and in the event he should contest any provision of the will, this bequest was to be null and void, and her executor was directed to collect all sums due her from Carl upon the annuity contract, (3) the home in Tripoli to Will, (4) remainder of estate to Will, (5) Will was nominated executor without bond.

There is evidence that Will admitted that a couple of days after he took his mother to the lawyer's office where the will was drawn he again brought her from Tripoli to Waverly, took her into two banks there and secured $2,900 she had in certificates of deposit, and that Will said, in reference to this, "He paid interest on it, gave her so much that she needed for living and all kinds of excuses, he had." He said he and his wife had the $2,900, "And that some of it his daughter had and the rest he didn't care where it was or what became of it."

Mary Behrend died February 17, 1937. Shortly thereafter the instrument in controversy was offered for probate and Carl interposed this contest. Will was appointed special administrator of the estate and listed as its assets the home in Tripoli, $20 in cash, $1,848.40 in banks, and $1,250 due from Carl on the annuity contract.

Dr. Borchert who had attended testatrix most of the time

between 1926 and her death was the only witness who detailed her physical and mental condition. For about ten years prior to her death she had suffered from exophthalmic goiter, arteriosclerosis, Brights' disease, splenitis, and cirrhosis of the liver, all of which were of a progressive nature.

The goiter was toxic in character and was first noticed by the doctor in 1926. It was evidenced, among other things, by protrusion of the eyeballs, enlargement of the thyroid gland, palpitation of the heart and tremors of the hands. In 1930, the thyroid gland on one side was the size of an egg. By that time the toxic condition had caused nervousness and irritability, a slight swelling of the lower limbs, discoloration of the skin anemic in character, ears lacking blood, palpitation and impaired heart action. From 1927 she suffered with Brights' disease, an inflammation of the kidneys, and her condition was also complicated by arteriosclerosis which in her case came on too early in life.

By 1931 ''her age was advancing fast'' due to the toxic condition of the goiter and her blood vessels began to get hard like pipe stems. The doctor noticed the circulation was then somewhat obstructed in such organs as the liver, kidneys, spleen, and also the brain. He testified the spleen is an organ that renovates and de-toxifies the blood and if somewhat interfered with will not function properly. In 1931, there was sufficient poison in her body to cause her to have a temperature. She was very nervous and excited, was getting slower in thinking, had difficulty in remembering, and had less power to control her speech.

By 1933, all her organs were acting more slowly and she was having more difficulty in getting around. She appeared to be under a mental strain from worry. The goiter had undergone fibrosis, her vascular system was hardening, obstructing the circulation to the various organs and interfering with the nutrition of the brain. The spleen was enlarged, the liver was shrunk and in a state of cirrhosis. She had dizzy spells and fainting spells resembling a state of coma, caused by her heart being affected by the poisons in her system resulting from her ailments. The poison in her blood affected her brain. In the opinion of Dr. Borchert,. by December 1933 her brain and mental conditions could not be normal and she was then of unsound

mind though she might have been sound enough to do certain things but not anything very important.

Her exophthalmic goiter continued to progress rapidly. By the year 1935, her body was more toxic, her organs seemed to be more involved, she walked somewhat slower, she couldn't concentrate and couldn't compose as quickly as before. She was nervous, irritable and excitable. ''She couldn't answer my questions, and they were simple questions, the same as I had asked prior to that time.'' Lack of nutrition was having an effect on the brain cells, it degenerates them and replaces them with connective tissues. The mind becomes somewhat demented. Senile dementia is the softening of the brain and follows arteriosclerosis. At the time the doctor saw her in 1935, she was, in his opinion, of unsound mind. ''She had been very poorly in judging and she was more or less feeble-minded and she had undergone somewhat dementia so that she was slow and could not remember and she could not judge the way she done before. On November 5, 1935, I would not consider her being normal and she must be of unsound mind because there never was a time but she was sick.'' She was too sick with these sicknesses and too toxic and her mind would be impaired.

At times she walked a short distance down town and to church but her walk was far from normal. She could count out money and could buy groceries and coal. She was a good housekeeper and kept herself clean. At times you could talk to her and at times she could carry on a conversation with her neighbors. ''Later years she was not living right. She couldn't live right because she was not in condition to take care of herself right, and she didn't have the care either.''

Following the foregoing evidence of Dr. Borchert was the testimony of Dr. Nicholas Schilling relative to the various ailments of testatrix. He said an exophthalmic goiter affects the judgment, initiative, and will power of the patient, and will cause insanity. In its final stages it affects the mind to a large extent and sometimes produces coma or dizziness. The mind of a 70-year-old person suffering with arteriosclerosis and who had been suffering with toxic goiter for six years would be bound to be impaired. This doctor had not examined testatrix but heard the testimony of Dr. Borchert. Based upon this, in his opinion, testatrix was of unsound mind on November 5, 1935. He made

the same answer to a hypothetical question based upon evidence introduced at the trial. The testimony of Dr. L. D. Jay, who had not seen testatrix, was similar to that of the other doctors.

The will contest was tried to a jury. At the conclusion of contestant's evidence proponent's motion for directed verdict was sustained and the will was admitted to probate. A motion for new trial was overruled, and contestant has appealed.

I. After prononent's formal proofs the burden of showing lack of mental capacity of Mrs. Behrend was upon contestant. One ground for the direction of the verdict was that the evidence of mental incapacity was insufficient to take the case to the jury. We have repeatedly held that mere deterioration in physical or mental powers does not destroy testamentary capacity until the mental decline reaches such stage that the person is unable to intelligently comprehend the estate of which he is possessed and the natural objects of his bounty and to intelligently exercise judgment and discretion in the disposition of his property. In re Estate of Johnson, 222 Iowa 787, 269 N. W. 792.

This rule of law is more difficult in the application than in the expression. Mental condition is not always easy to define and classify. The evidence may be conflicting or the lines of demarcation indistinct. Each case must turn upon the record incident thereto.

The case at bar is somewhat unusual in that practically all the evidence of Mrs. Behrend's mental condition comes from the lips of one person, Dr. Borchert. As her attending physician most of the time during the last ten years of her life he was qualified to picture her condition. His testimony may be construed as depicting in 1927 a woman, prematurely old at 66, suffering from toxic goiter, arteriosclerosis, Brights' disease, and other ailments which prevented proper nutrition of her organs and kept her body poisoned; that her ailments were progressive, resulting in a rapid increase of her apparent age and an accelerated physical and mental decline so that by 1931 there was a noticeable deterioration in her mental condition; that by 1933 her physical condition was decidedly worse and her mentality impaired to such an extent that in his opinion she was then of unsound mind, although she might then have had sufficient mentality to do certain unimportant things; that

by November 1935 (the date of the will) her diseases were in advanced stages, that her brain cells had been affected, she had undergone dementia somewhat, was more or less feeble-minded, had lost her ability to remember and to "judge", was unable to answer simple questions, was continuously sick and toxic and was of unsound mind.

As above noted proponent's evidence was limited to formal proof of the execution of the controverted instrument. Consequently, there was no testimony directly contrary to that of Dr. Borchert. There were contrary circumstances shown, such as that at times Mrs. Behrend could carry on a conversation, that she bought her own groceries and coal, that she lived alone and took care of herself, though perhaps not properly in her last years, and that at the time the instrument was executed she requested parties present to witness it. However, these, and other circumstances, at most, tended to create a conflict in the evidence. Under the record we conclude the evidence of lack of testamentary capacity was sufficient to have supported a verdict for contestant based thereon, had the jury so found. Therefore, the refusal to submit the case to the jury was erroneous.

In view of the foregoing conclusion other assigned errors will not be considered. The record upon another trial may be different.

Nothing contained herein is intended as an expression of opinion concerning the weight to be given any of the evidence. That would be for the jury to determine. We hold only that the case should have been submitted to the jury upon the question of the mental incapacity of testatrix.—Reversed.

HAMILTON, C. J., and RICHARDS, HALE, MILLER, and BLISS, JJ., concur.

SAGER, J., takes no part.