SADIE CHARLSON, guardian of the property of Gurine Dahlseide, voluntary, appellant, v. THEODORE E. BRUNSVOLD, appellee.

No. 49372.

(Reported in 89 N.W.2d 344)

APRIL 9, 1958.

Eugene G. Sarno, of Lake Mills, and L. E. Plummer, of Northwood, for appellant.

Frank H. Kreamer, of Northwood, and Mason & Stone, of Mason City, for appellee.

OLIVER, J.—This is an action at law by Sadie Charlson, guardian of the property of her adoptive mother, Gurine Dahlseide, to recover the amount of a gift of $2520 made June 3, 1955, by Mrs. Dahlseide to defendant, Theodore E. Brunsvold, on the ground the donor was mentally incompetent to make it. Defendant is a brother to Mrs. Dahlseide. She was then eighty-five years of age. For many years she had lived with her husband and adopted daughter, Sadie, on a 160-acre farm in Worth County. They had no natural children. Sadie married Sherman Charlson and they lived on the farm with the Dahlseides. The Charlsons have five children. Mr. Dahlseide died in 1943. Under his will Mrs. Dahlseide received a life estate in the farm, remainder to Sadie Charlson. Since 1940 Sadie and her husband had handled the farm as tenants and the Dahlseides had lived with them. After Mr. Dahlseide's death Mrs. Dahlseide continued this arrangement and Sadie cared for her, wrote and signed all her checks and, with Mr. Charlson, handled her business affairs.

Mrs. Dahlseide suffered a heart attack and was ill for several months beginning with December 1954 or January 1955. She was attended by Dr. Richard W. Hill. Her sister, Mrs. Eschrich, who resided in South Dakota, visited the Charlson home from March to May 30, 1955. Mrs. Eschrich asked to see Mrs. Dahlseide's papers and securities. Mrs. Charlson secured them from the family safe and handed them to Mrs. Eschrich. They consisted of a certificate of deposit for about $6000 belonging to Mrs. Dahlseide and about $5000 in bonds, registered in the name of Mrs. Dahlseide or Sadie Charlson, as joint owners. Mrs. Dahlseide had no other personal property. Sadie Charlson testified

Mrs. Eschrich did not return the securities to her. Mrs. Eschrich had previously made inquiry relative to the adoption papers of Sadie Charlson which would prove Sadie to be Mrs. Dahlseide's sole heir-at-law.

After Mrs. Eschrich obtained possession of the securities defendant called at the Charlson home for Mrs. Dahlseide and he and Mrs. Eschrich took her to defendant's home. Apparently she had not been away from the Charlson home for some time. Someone had arranged for the presence at defendant's home, of Earl Granskow, the cashier of the bank at Joice which had issued the certificate of deposit and in which Mrs. Dahlseide had a small checking account. Mr. Granskow testified defendant, Brunsvold, Mrs. Eschrich and Mrs. Dahlseide sat in a room together and discussed the division of Mrs. Dahlseide's money. Mrs. Dahlseide asked Mr. Granskow to draw a will for her. He understood he had been invited to the meeting for that purpose. However, he did not do this.

The transaction here in question was consummated June 3, 1955. Mrs. Charlson testified that at the time her mother was physically weak and shaky and "was very forgetful. She repeated things many times a day, probably start in the morning and keep on the same subject many times a day. Different people came and they were probably outside visiting with my husband, Sherman, and he would tell who was there and she would ask maybe five or six times who was out there." Mrs. Eschrich had been called back to South Dakota by the imminent death of her sick husband and did not participate personally in the June 3 transaction.

On that date defendant and his wife called at the Charlson home for Mrs. Dahlseide and took her to the bank at Joice. They went to the directors' room and there discussed the disposition of Mrs. Dahlseide's money. Mr. Granskow testified the Charlsons had been taking care of her business and had signed the necessary checks for her and she had not signed a check for years. He cashed the $6000 time certificate and six bonds for her and deposited to her account $7780.90, thus secured. He also prepared three checks, each for $2520, payable to defendant, to Mrs. Eschrich and to G. E. Brunsvold (another brother) respectively. Mrs. Dahlseide signed the checks and they were handed to de-

fendant. Defendant cashed the check made payable to him. Mrs. Dahlseide's shaky signature on that check misspelled her name as Dahlsed.

Mrs. Charlson testified: "On the third Sunday in June, 1955, my mother wanted to know where her bonds were and, after talking with my mother, my husband went to the bank at Joice to find out what had happened to her money." After Mrs. Dahlseide "found out her money was all gone, she got worse and worse, and it was money, money, money, all day long, that's all I heard. She'd sit and she'd pound upstairs, you could hear her, she'd pound like that, she was just aggravated to think that anything like that could happen." Mrs. Dahlseide was taken to see defendant. She asked him to return her money "because she said that wasn't the way she wanted it. * * * She wanted to give it to the missions and she had grandchildren to give it to * * *." Defendant testified: "I told her I would see about it." Upon Mrs. Dahlseide's application Sadie was appointed guardian of her property. Mrs. Dahlseide's two signatures on the application were misspelled, Dahalsied and Dahlside.

July 21, 1955, Mrs. Dahlseide was placed in a nursing home and has since been kept there. The nurse who operated the home testified her condition at the time of the trial, February 1957, was the same as when she was brought to the home: "She was what I would call senile and at times very forgetful. She would ask the same thing one day and the next day repeatedly ask it again. * * * she doesn't recall when people have been in the home to see her. * * * Mrs. Charlson visited her mother several times. * * * She wouldn't remember that she had been in. She eats at the breakfast table and she is not what I would call alert. * * * She helps dress herself. She is able to take care of herself personally to a certain extent and she is up and around." She regularly took medicine prescribed by a doctor, for people who are mentally (affected) to make them quiet, to like themselves better and to be of a better nature and easier to handle.

The defense presented the testimony of three witnesses. C. J. Brunsvold, a nephew of Mrs. Dahlseide who lived on a near-by farm, testified she wanted him to help her make a will and he did not think he should do it because he "thought there maybe would be friction. She wanted to give five hundred dollars to each of

the three sisters of Martin, a thousand dollars to the church and the rest of it to Theodore, G. E. Brunsvold and Mrs. Eschrich. \* \* \* She knew she had about six thousand dollars on deposit in the bank and she had some bonds, but I don't think she knew exactly how much she had. \* \* \* After March 1955 \* \* \* she kept on with that all the time and I got awful tired with it. After June 3, 1955, she said she had given away her money and she was through with it. \* \* \* she seemed to understand what she was talking about \* \* \* what she wanted to do with her property. She wanted to give it away. She seemed to be the same as she used to be except she was ill. She said she was mad at the two Charlsons. When I observed her I would say that she was normal."

Defendant testified: "Prior to June 3, 1955, Mrs. Dahlseide told me that she wanted to give away her property. \* \* \* She said she was going to give some to Martin Dahlseide's sisters and was going to give some to the church and then she was going to divide out among us brothers and sisters. \* \* \* She discussed the contents of the will with me. \* \* \* On June 3rd we went to the bank. In my opinion, Mrs. Dahlseide was normal that day. Later on she came to see me. She was kind of excited. They put pressure on her, of course, she asked for the money, \* \* \*. I saw her in Clear Lake [the nursing home] last fall after I was sued. She said, 'Don't give it back to them.' In my opinion she was normal on this occasion." The testimony of defendant's wife was along the same lines.

Mrs. Eschrich had presented for payment the $2520 check given her and payment upon it had been refused. She did not testify in the case. Nor was Mrs. Dahlseide a witness although there was testimony her condition then was the same as when she was placed in the nursing home, and defendant had testified to a statement claimed to have been made by her after the case at bar was instituted in August 1956.

■ Generally speaking, the mental capacity necessary to enable a person to qualify as a witness is less than that required to make such person competent to make a valid gift inter vivos.

The petition alleged Mrs. Dahlseide was mentally incompetent to make the gift. Defendant's motion for directed verdict was based in part upon plaintiff's asserted failure to establish

that allegation. This part of the motion was overruled. However, the opinions of nonexpert witnesses for plaintiff as to Mrs. Dahlseide's mental competency were ordered stricken.

The jury returned a verdict for plaintiff. Defendant then moved for judgment notwithstanding verdict, under R. C. P. 243(b), which authorizes this procedure when a party entitled to a directed verdict, at the close of the evidence, moves therefor and the jury does not return such a verdict. Defendant's motion was sustained and judgment in his favor was rendered. Plaintiff has appealed.

The distinguished trial judge pointed out that the case had been tried and submitted to the jury under the well-established rule with respect to testamentary capacity, that the mental capacity to make a valid gift means: "The mental capacity (1) to understand the nature of the transaction or instrument she is executing, (2) to know and understand the nature and extent of her property, (3) to remember the natural objects of her bounty, and (4) to know the disposition she desires to make of her property. While this case involves an inter vivos gift, no question has been raised about the applicability of this rule in this case."

Nor has any such question been raised in this appeal. Hence, without so deciding, this will be assumed to be the correct rule.

It is the rule that if the mental capacity of a testator is not equal to any one of the four tests, above stated, he cannot make a valid will. In re Estate of Rogers, 242 Iowa 627, 634, 47 N.W.2d 818, and citations.

Doctor Hill testified he treated Mrs. Dahlseide from January 1955 until she was placed in the rest home. He diagnosed her ailment as cardiac failure, cardiac decompensation. Her underlying illness was caused by hardening of the arteries. After her recovery from her acute illness she was senile. "She had all the typical findings of an old person with cerebral arteriosclerosis. She had practically no recent memory * * *. The process that takes place is that the arteries harden in the brain ahead of normalcy, say, well then, the circulation is impaired to the brain and * * * when the brain doesn't have its normal amount of circulation the vast majority of functions it will perform well, but many of the finer things that the human mind does it won't do. Outstandingly these people are forgetful; * * * such a con-

dition gives deceptive appearance of normalcy even to a physician. * * * probably the one outstanding thing is their loss of memory or especially recent memory. * * * These patients are at times very unco-operative and their thinking just isn't normal * * *. I believe she [Mrs. Dahlseide] was an arteriosclerotic and not capable of performing business or financial transactions."

The damage to Mrs. Dahlseide from arteriosclerosis was definitely to the brain. "Cerebral sclerosis is a hardening of the vessels that lead to the brain in its entirety. * * * I would say loss of memory, near memory, not forgetfulness, is one of the characteristics of the disease."

Doctor Hill's testimony was based upon his actual observations in connection with his treatment of Mrs. Dahlseide. It is true he did not, in so many words, express the opinion Mrs. Dahlseide was not of sound mind. However, his testimony she was an arteriosclerotic, had no memory and was not capable of performing business or financial transactions should be considered in connection with all of his testimony and with other parts of the record.

According to the testimony of the operator of the nursing home, Mrs. Dahlseide, during the one and one-half years prior to the trial, was up and around but had little or no memory and merely helped dress herself and took care of herself "to a certain extent." There was evidence she did not realize for some weeks after June 3, 1955, that she had disposed of her property and money and did not understand what had become of it.

Nor was Mrs. Dahlseide one of those persons whose business activities up to the time in question tend to cast doubt upon evidence of their mental incompetence. She had not transacted any business since sometime prior to the death of her husband in 1943. The record indicates no activities of any kind on her part during that period. The Charlsons cared for her, kept up the farm and paid the expenses, taxes, etc. Mrs. Dahlseide had a small bank account but had not written or signed a check for many years. The few withdrawals made were upon checks written and signed by Sadie Charlson. It appears that in June 1955 Mrs. Dahlseide was unable to sign her own name correctly. The spelling in each of her three signatures shown in the exhibits is incorrect and no two of them are the same.

The gifts to defendant and the others were unnatural and unreasonable. Mrs. Charlson is her mother's sole heir-at-law and, the record indicates, has been closer to her than any other person. The dividing of Mrs. Dahlseide's property among two brothers and a sister as contemplated in the plan defendant discussed with her would be unfair and unjust. No good reason is shown for the gift of her property to others to the exclusion of Sadie and her children.

Richmond v. First National Bk., 189 Iowa 704, 707, 179 N.W. 59, 61, states: "True, one who *is* competent may make an unreasonable, and even an utterly unnatural, disposition of his property. But that is only *if* he is competent. But, when the question is whether he is competent, then the fact that he deals with his property in an unnatural manner will, when added to such testimony as has been adverted to, warrant a jury in finding that the party was incapable of transacting business and of disposing of his property. An unnatural and unreasonable disposition of property may be shown, as bearing on the issue of mental condition." (Citations)

In the language of In re Estate of Rogers, 242 Iowa 627, 634, 47 N.W.2d 818, 822, supra: "This is another circumstance which, while not controlling, and not in itself sufficient to support a finding of lack of mental capacity, may be taken with other matters as enough to warrant submission to the jury for its verdict."

In re Estate of Kenny, 233 Iowa 600, 608, 10 N.W.2d 73, 78, holds: "This is a proper circumstance to be considered in determining whether she was of sound mind." (Citations)

In the case at bar a circumstance, not present in the cited case, is that part of the money for the gift was obtained by cashing bonds apparently registered in the name of Mrs. Dahlseide or Sadie Charlson. Another circumstance is that the planned disposition of Mrs. Dahlseide's property would have left her with only a small amount of money. The first report of the guardian shows $5419.16 cash, $3150 U. S. Savings Bonds registered in the name of Mrs. Dahlseide and Mrs. Charlson, and the $2520 claim against defendant, here involved. The stopping of payment on the two other gift checks saved most of this cash for Mrs. Dahlseide, at least temporarily. The cost of

keeping her in the nursing home is about $1460 per year and there are also expenses for medical care, clothing, etc. Under the circumstances shown in the record, the gifts appear to have been improvident.

There is substantial evidence in the record that Mrs. Dahlseide did not have sufficient mental capacity to make the gift to defendant. Hence, that question was one of fact for the jury. It follows the court erred in sustaining defendant's motion for judgment notwithstanding verdict and in rendering judgment for defendant. Although there are no cases directly in point on the facts, this conclusion finds support in the following decisions: In re Estate of Rogers, 242 Iowa 627, 47 N.W.2d 818; In re Estate of Van Dyke, 245 Iowa 942, 65 N.W.2d 63; In re Estate of Kenny, 233 Iowa 600, 10 N.W.2d 73; In re Will of Behrend, 227 Iowa 1099, 290 N.W. 78; In re Estate of Ring, 237 Iowa 953, 22 N.W.2d 777.

The judgment is reversed and the cause is remanded for judgment for plaintiff on the verdict of the jury.—Reversed and remanded.

PETERSON, C. J., and GARFIELD, WENNERSTRUM, HAYS, THOMPSON and LARSON, JJ., concur.

SMITH, J., not sitting.

BLISS, J., takes no part.