CHARLES M. WILSON, individually and as coexecutor of the estate of JOHN L. WILSON, Appellants, v. JOHN L. WILSON III, Appellee.

No. 47322.

(Reported in 34 N. W. 2d 911)

DECEMBER 14, 1948.

Miller, Miller & Cousins and E. C. Halbach, all of Clinton, for appellants.

M. L. Sutton, of Clinton, and Wayne G. Cook, of Davenport, for appellee.

SMITH, C. J.—John L. Wilson, of Clinton, died testate August 31, 1946. He left two sons, Charles M. Wilson and John L. Wilson, Jr., both of Clinton county, a married daughter, Vernie Wilson Clarke, of Maquoketa, Jackson county, and four grandchildren: Ione Rickoff, daughter of Charles M. Wilson, Marian Donielson, daughter, and John Clarke, son, of Mrs. Clarke, and John L. Wilson III, son of John L. Wilson, Jr.

Decedent owned approximately 420 acres of Clinton county land comprising ten and one half forty-acre pieces, located in Sections 25, 35, and 36, and forming a large irregularly shaped tract, divided, in later years, into two farms, with two sets of buildings. A road ran through the tract easterly and westerly along or near the line between Sections 25 and 36. The deed in question here was for the forty acres furthest north. It was executed October 29, 1943, and ran from decedent to his grandson, John L. Wilson III, defendant herein. It was not recorded however until January 18, 1946, about seven months before Mr. Wilson's death and over two years after its execution.

Decedent's will was dated August 29, 1938. His wife died in 1937. Sometime between these dates he and his two sons had a discussion concerning the occupation, use, and proposed division of decedent's real estate. Charles had been farming four forties (including the one in dispute here) and a twenty (approximately 180 acres in all) on a cash rent basis, and John L. Jr. occupied the rest. Decedent told his sons he expected to make the same division of land in his will and enlisted their assistance in getting the legal descriptions. Each was in the meantime to continue in possession of what he had been farming, pay a certain fixed rent per acre and the taxes on the land he

occupied. Plaintiff testified: "Father said I was to get the 180 and my brother was to get the other. He was getting more land than I was but he was to pay my sister."

The will as subsequently drawn gave John L. Jr. a five-acre strip off the west edge of one of Charles' forties. All John L. Jr.'s acreage however was devised to him *for life* only with remainder "to my grandson John L. Wilson [defendant herein] *for and during his lifetime* and upon his death to his lawful living issue, if any, *per stirpes* and not *per capita.*" The will then provided that if the grandson left no issue the land was to go as if testator had died intestate. There was a ten-acre piece in the devise to John L. Jr. not included in the 420 acres heretofore referred to but the record is otherwise silent as to it. Testator's two sons were named residuary beneficiaries and as executors without bond.

In 1940 (March 8) decedent deeded to each son the forty acres upon which his home buildings were located in order that each could have the benefit of the homestead tax exemption upon the land upon which he was paying taxes. The home deeded to John L. Jr. was the old Wilson homestead where decedent and the family lived before he and his wife moved into the city of Clinton. The Charles Wilson home buildings were newer. The two houses were somewhat less than one-half mile apart. In an earlier day, before moving to town, decedent occupied the entire 420 acres as one farm.

The deed to defendant, John L. Wilson III, is attacked here on grounds of grantor's alleged mental incompetence and subjection to undue influence. At the close of plaintiff's evidence the issue of undue influence was dismissed as unsupported by any evidence. At the close of all the evidence the court entered decree for defendant. Charles M. Wilson, personally and as coexecutor, appeals. In making up the issues defendant caused to be brought in as parties Alvin Dohrn and wife, tenants under Charles M. Wilson, but apparently they are not concerned in this appeal.

There is impressive evidence of much mental deterioration in the "Senator" (as decedent was universally called) commencing about or somewhat prior to the date of execution of the deed in question. His condition is described as growing pro-

gressively worse from about that time until his death in 1946 at the age of eighty-nine years.

A statement of the evidence in too great detail would be uninteresting and not helpful. It will suffice to indicate its general character. Decedent was originally a farmer but early entered public life. He was state senator from Clinton county for many years. He also became interested in the farm insurance business, became an official of one or more companies and wrote insurance.

According to the testimony his failing mental condition was shown in various ways—by errors in dressing himself, putting dish towels and other cloths around his neck or in his pocket, erratic and dirty table habits, using various parts of the house as a toilet, turning on gas jets, losing interest in reading and in radio programs and other things formerly enjoyed by him, difficulty in using the phone, childishness in trivial matters; getting lost in the neighborhood, failure to recognize people he should know, carelessness in handling money, erratic conduct in attempting to care for the yard, inability to preside at the Old Settler's Reunion and peculiar conduct in many other ways.

The evidence of these matters is furnished by many witnesses, some undoubtedly partisan but most of them impartial and disinterested.

The only expert who testified was Dr. Riggert who at one time lived in decedent's neighborhood but who testified only as to three occasions in 1940, 1941, and 1942, when he was called to treat the Senator for physical ailments—lung or bronchial infection, general disability, arteriosclerosis and restlessness at night.

The doctor expressed the opinion, based upon his own observation and the history he got from Mrs. Grimm (Mr. Wilson's housekeeper), that Mr. Wilson "was becoming senile" which term he defined as "unsoundness of mind." In answer to the one hypothetical question asked him he answered: "Well, it is an indication of * * * cerebral degeneration, typical of the arteriosclerotic" which in a person of that age "becomes progressive."

On cross-examination he said that a person suffering from

senile dementia would have "varying degree of symptoms at different times during the course of the disease" and that even though the disease was progressive "such a person may be quite irrational one day, and to all intents and purposes and from all observations perfectly alert mentally and perfectly normal the next day or a week later."

There was considerable testimony of witnesses who apparently saw the Senator in his brighter moments and deemed him normal. He visited one friend, Attorney Burke, in 1944, soliciting his aid or influence with officials in getting a road "fixed up." This witness, who had known Mr. Wilson well for thirty-nine years, said positively that his mental condition "was exactly as it had always been." Mr. Burke in 1944 also assisted him with an absent voter's ballot and after it was sealed visited for twenty minutes. He expressed the same opinion as to Mr. Wilson's alertness on that occasion.

There was other testimony of similar import. Attorney Martinsen, who drew the deed in question and also the earlier deeds, testified as to both occasions; also as to another in between when a deed of forty acres to John L. Jr. was prepared and executed covering the forty acres where some of the buildings were situated across the road from the homestead. When the deed in controversy here was drawn both defendant and his father came with Mr. Wilson to the law office. Both son and grandson say the trip was of decedent's arrangement entirely and that they did not know its purpose until they arrived.

Attorney Martinsen and his wife who worked in his office at the time are very definite and positive as to the Senator's clear and normal mental condition. He stated his wish to convey a forty to his grandson: "Johnnie has been a good boy, and I want to keep him interested in farming." "After all, young Johnnie is the only namesake, carrying down the name of Wilson." The attorney, who had known the Senator for twenty-five years, says "he appeared to me normal in every respect, the same as always."

The description of the particular forty decedent wished to convey was looked up in the plat book. When the deed was signed and acknowledged it was handed to the Senator who in turn delivered it to his grandson laughingly saying, "Now you

are a property owner." John L. Jr. suggested that his son should pay the one dollar consideration named in the deed. When the dollar was paid the Senator smiled and put it in his pocket.

Attorney Martinsen made out Mr. Wilson's income tax for various years, including 1944 and 1945, each time getting the necessary data from him. Both the attorney and his wife are clear in their testimony as to his mental condition on all these occasions. There is much detail on both sides which we are omitting, trying however to give a fair picture of the record.

■ I. What is a court to do in the face of such apparently conflicting testimony? We must start with the usual presumption of sanity. Jorgensen v. Coffie, 238 Iowa 1268, 1270, 30 N. W. 2d 116. The burden was on plaintiff to overcome it. Mastain v. Butschy, 224 Iowa 68, 84, 276 N. W. 79, and cases cited; Foster v. Foster, 223 Iowa 455, 457, 273 N. W. 165.

This was not a transaction of bargain and sale but a gift of property to a natural object of the grantor's bounty, somewhat analogous to a testamentary deed. At least we may assume under the evidence it was made during a period in which the Senator was thinking of plans for final disposition of his property.

■ Most if not all plaintiff's evidence related to incidents and occasions unrelated to business or property transactions or to the one involved here. The witnesses for defendant, on the contrary, testified largely to occurrences more directly pertaining to decedent's conduct and appearance in property matters. There is no testimony of any confusion or erratic conduct on such occasions. We have here to determine his mental condition at the very time he executed the deed in question. 26 C. J. S., Deeds, section 54, page 264, note 95.

The doctor who testified as to mental unsoundness freely admitted the possibility of subsequent sane or lucid intervals, though not of any permanent recovery. The transaction itself is neither so incredible nor so unusual as to arouse wonder or suspicion. Back in 1938 at a time when the Senator was admittedly sane he quite materially changed his plan of distribution by will from the one he had in mind when he talked with his sons a short time before. Instead of devising the land out-

right to his son John L. Jr. he gave him a life estate only, with remainder life estate to the grandson John L. III, either contingent or subject to be devested. (We are of course not assuming here to define its exact character.)

Plaintiff testified as to the values of the various pieces of land and the figures he gave indicate that he was getting considerably less in value than his brother, even if the forty in question here had not been excluded. He understood this was because his brother was to pay the cash bequest to their sister. But the will as drawn required both brothers to contribute to that purpose. Manifestly testator had no thought that by the preliminary discussion with his sons he had bound himself to the arrangement then suggested.

As to the apparent conflict in testimony touching decedent's mental condition we cannot do better than quote from the opinion of the trial court who saw all the witnesses and was doubtless well acquainted with some of them:

"There is not too much conflict in the testimony of the witnesses. The grantor was an old man. Some witnesses said he was of unsound mind while others said he was of sound mind. On the whole, no fault can be found with the conclusions of the witnesses. Ordinary people do not do what witnesses for plaintiffs say the grantor did. On the other hand, the witnesses for defendant did not see those things and to them the grantor appeared to be quite normal so in their opinions he was of sound mind. * * *

"Under well established law the question to be determined is quite narrow and is as to the mental condition of the grantor at the time the deed was executed. Judge Martinsen and his wife say the grantor was then of sound mind. They knew him. They saw nothing unusual in him, either as the individual who had frequently come into the office or as the common run of mankind goes. They relate what the grantor did and said. They appear to be entirely disinterested. There is no reason to doubt what they say the grantor did and said. The picture portrayed by them is one of very common occurrence in the office of the average lawyer. The grantor acted like himself and as normal persons do under like circumstances. He told what he

wanted done and knew in detail what he wanted. They say he was of sound mind.

"The question then is whether the evidence of the witnesses who say that the grantor was of unsound mind fairly requires a finding that 'notwithstanding the normal actions and mental reactions of grantor at the time the deed was executed, he was nevertheless of unsound mind. * * *. The doctor said that in the ordinary run of men of his type there might well be periods when he should be normal; other persons say there were times when in their judgment he was normal. In this situation the fact that at many times he was of unsound mind cannot outweigh the evidence which establishes that when the deed was executed, grantor was normal. It will be understood, of course, that the word 'normal' is not used with technical nicety."

It is a fact question. Precedents are of little value but see: Evers v. Webb, 186 Iowa 1172, 1178, 173 N. W. 264, citing Elwood v. O'Brien, 105 Iowa 239, 240, 74 N. W. 740. We cannot, under this record, doubt Senator Wilson's competency to make this gift to his grandson.

II. On the question of undue influence little need be said. It may of course be conceded that weakened mental condition is a factor to be considered. Relationship of the parties, inequality of distribution and activity of a beneficiary might under some circumstances become important. These are the propositions relied on by appellant.

It is manifest to us that under this record these elements did not control here. It is true defendant's father was associated with decedent in the insurance business but there is no such showing as to establish the existence of confidential relationship, or of such dependence of decedent upon his son and grandson as to cast on them the burden of disproving undue influence. See Humphrey .v. Norwood, 213 Iowa 912, 918, 240 N. W. 232.

There is no such inequality of distribution of testator's property between his two sons as to arouse suspicion. Plaintiff received his share outright while his brother was given only a life estate. The difference in acreage and value would not be

impressive even if the deed here had run to John L. Jr. himself instead of to his son.

Nor is it likely that Mr. Wilson intended to convey to his grandson (as argued by appellant) the forty immediately south of the one described, which would have come off John L. Jr.'s acreage instead of his brother's. This suggested forty was the one north of and across the road from the house on John L. Jr.'s homestead and it contained the other buildings belonging to the homestead. It had already been conveyed to John L. Jr. for that reason. There is no basis for a suspicion that any mistake was made.

We attach no significance to the circumstance that Mr. Martinsen asked the Senator "if he had been persuaded" or "influenced." Both defendant and his father testified to it but the attorney did not mention it. It was not much different from —may in fact have been—the usual question as to voluntary act and deed in taking the acknowledgment. If it was more than that the inquiry could only have been suggested by the fact that Mr. Wilson came to the office with his son and grandson. In any event the Senator promptly disavowed any influence or persuasion and the affirmative testimony of the other parties denies it.

Some point is attempted to be made of the fact that the county recorder was requested not to let the paper see the deed when it was recorded. Both defendant and his father say the deed had been withheld from record at grantor's request. Mr. Wilson was still living when the deed was recorded. We do not consider the fact very persuasive of undue influence.

The same may be said of the circumstance surrounding the procuring and canceling of the revenue stamps. Defendant and his father were mistaken and clearly wrong as to when the stamps were attached. But the matter is unimportant to the issues here. Affixing of the stamps was not essential to the validity of the deed and the time of affixing and canceling them was not important. 26 C. J. S., Deeds, section 36.

We have examined the record with care on both issues presented. Much more of it might be set out both pro and con.

We have thought this much necessary, but also sufficient. The decision of the district court is right and is affirmed.—Affirmed.

All JUSTICES concur.