JESSIE WILCOX, guardian of CORA MAY WILLIAMS, appellant, v. FLAVE HAMBORG, executor of estate of SYLVESTER C. WILLIAMS et al., appellees.

No. 47801.

(Reported in 46 N.W.2d 530)

MARCH 6, 1951.

Herbert H. Hauge, of Des Moines, and William F. Morrison, of Iowa City, for appellant.

Lappen & Carlson, of Des Moines, for appellees.

BLISS, J.—Mr. and Mrs. Williams, an elderly, childless couple, had been married many years. She obtained title to a residence property at 3211 Cottage Grove Avenue, Des Moines, in October 1915, which they occupied thereafter. He was a railway postal clerk until he reached the retirement age, some years ago. On June 20, 1947, he made a will leaving his property, subject to provisions for the care of his wife, to the University of Iowa, to provide a trust fund for loans to needy students, preferably those who had finished as sophomores, and attended a Christian church or denomination. He also bequeathed $500 each to two sisters. He died November 16, 1948, at the age of seventy-eight years. His widow was then eighty-two years old. One of the sisters preceded him in death. On October 29, 1947, he joined his wife, Cora May Williams, in the execution of a warranty deed conveying to Jessie Wilcox a tract of land, 6.7 acres, in or near Des Moines, for a consideration of one dollar and other valuable consideration. This unrecorded deed was found in his bank safe-deposit box after his death. On the same day that said deed was executed and acknowledged—October 29, 1947—Cora M. Williams executed a warranty deed to the home at 3211 Cottage Grove Avenue to her husband, S. C. Williams. The consideration recited was "One dollar, love and affection." Both deeds were acknowledged before E. A. Tyler, seventy-four years old, and the president of the First Federal State Bank in University Place, Des Moines. He had known both of them for over twenty-five years. This deed was filed for record on November 25, 1947. It is this deed which is sought to be set aside.

The inventory of S. C. Williams' estate lists this homestead property as part of the estate, at an estimated value of $10,000. The total estimated value of the entire estate, as stated in the

inventory filed February 1, 1949, is $53,852.60, with no liabilities shown. Mr. Williams had no near relatives, and the nearest kin of Mrs. Williams are nine nieces and nephews. One of these is Jessie Wilcox, a farmer's wife living near West Branch, Iowa. She is the grantee in the acreage deed and the plaintiff herein.

Mrs. Williams, with advancing age, failed considerably physically in later years and her vision was impaired by cataracts. Her husband did much of the housework. After his death, she was placed in a home for aged people, called the Restorium, in West Des Moines, where she has remained at the expense of her own estate. On November 19, 1948, she filed a petition for voluntary guardianship of her property, reciting therein that she was born May 30, 1866, and that though sound in mind, she was infirm and in poor health from illness, and was desirous of having a guardian appointed to conserve her property. She subscribed and swore to this petition before State Senator George Faul. On the same day, November 19, 1948, Jessie Wilcox signed and swore to a verification of the petition stating that she was acquainted with the petitioner and that her age was stated correctly, and that she consented to be guardian. The petitioner's signature is plainly legible, but apparently due to her defective sight, she had difficulty signing on the line. The order of guardianship was made. Jessie Wilcox testified that she did not read the petition when she signed it.

On June 22, 1949, the guardian filed a petition, reciting that "Cora May Williams was a person of unsound mind for some time prior to November 19, 1948, and has for over two years been a person of unsound mind and is of unsound mind at this time." It further stated that the matter of the ward's election to take her distributive share or to take under her husband's will had to be determined by the court, and therefore it was prayed that the guardianship be enlarged to include the involuntary guardianship of both the ward and her property. Upon hearing, this order was made, and also an order on behalf of the ward electing to take her distributive share in her husband's property.

The order of the court of August 11, 1949, enlarging the guardianship, was made after a qualified psychiatrist had made a full examination and report of her physical and mental condi-

tion, as of July 29, 1949. The following statements are from the report:

"She is completely disoriented for time, place and person, does not know where she is at the present time, was not certain whether it was day or night, winter or summer or how long she had been where she is now. * * * The blood vessels are quite prominent, all over her body, are quite stem-like in character and roll easily under one's fingers. * * * Her blood pressure was 130 over 80 * * *. Diagnosis: Senile dementia, secondary to generalized arteriosclerosis. From my interview with this patient it would seem to me that she is not legally competent at the present time."

The court found that the ward "is now of unsound mind and has been of unsound mind since at least the time of her husband's death in October [November] of 1948 * * *."

The inventory of the guardian listed the house property and the acreage—each subject respectively to said deeds—and cash, bonds, stock, and household property of a total value of $16,-720.65. Included in the personal assets were $4620, being currency found in her safe-deposit box in the bank, the ownership of which was claimed by her husband's executor. The district court awarded the money to the guardian, and this court on appeal affirmed that decree on December 12, 1950. See In re Estate of Williams, 241 Iowa 1290, 45 N.W.2d 146. The will of her husband provided that she should be paid the income from his estate, estimated at something less than $2000 a year, and such other funds as she might need from the corpus of his estate.

The trial was begun on May 9, 1950, and decree sustaining the deed was rendered on May 17 following. Plaintiff alleged in her petition that for some time previous to October 29, 1947, and on that date, when the deed to her husband was executed, and for some time before and ever since, her ward had been incompetent and mentally incapable of comprehending and transacting her ordinary business affairs; and that because the husband was the dominating person in the relationship of confidence and trust existing between himself and his wife he took improper advantage of her and by undue influence secured from her said deed and property.

■ I. While plaintiff relied upon the decisions of this court in Paulus v. Reed, 121 Iowa 224, 96 N.W. 757, Kramer v. Leinbaugh, 219 Iowa 604, 259 N.W. 20, Merritt v. Easterly, 226 Iowa 514, 284 N.W. 397, Marron v. Bowen, 235 Iowa 108, 16 N.W.2d 14, and Olsson v. Pierson, 237 Iowa 1342, 25 N.W.2d 357, she urges that nevertheless each case is ruled by its own facts, as stated in Wilson v. Wilson, 240 Iowa 26, 33, 34 N.W.2d 911, Elwood v. O'Brien, 105 Iowa 239, 74 N.W. 740, and Evers v. Webb, 186 Iowa 1172, 173 N.W. 264. We agree with the rule announced in all of said cases, but although the marital relationship is normally one of the highest trust and confidence, the grantee or donee in every transfer of property between them is not to be suspected of having taken undue advantage of the other, where the circumstances do not fairly justify it.

Plaintiff introduced the testimony of five witnesses in addition to her own. The occupants in a house next door to the Williams home were acquainted with Mr. and Mrs. Williams for several years. Loretta Streb testified that she knew Mrs. Williams as a neighbor since 1940; that she had not noticed any mannerisms about her, and could recall no conversations since 1946 that were out of the ordinary, or in 1947 or 1948; she complained about her eyesight for a few years; she was a kindly old lady getting older with the years. Her sister, Mary Jane Streb, visited in the Williams home occasionally in the evening, or in the yard. She noticed a gradual decline in Mrs. Williams but could not state the time of it or when it started. She heard Mr. Williams read newspapers to her. Sometimes her conversation was not connected and sometimes she did not recognize her. She testified that she definitely did not know of any peculiar mannerisms as to any date; that her condition was not always the same, some days it was clearer than others; she had no palsy or trembling of the hands.

Sarah Snedden lived across the street from the Williams home. The families visited each other and always maintained a friendly relationship. Without other testimony, and over proper objection she testified that Mrs. Williams was not very well mentally in 1947; during the last year (1949) she did not recognize who the witness was, and at times in 1947 and 1948 she would recognize her and at other times she would not; the

first incoherent conversation she had with her was "all of three years ago." She testified that she and her husband took her to the Restorium after Mr. Williams' death, at which time her physical condition was "pretty good, but her mind was not so good"; that in the spring or summer, "longer than two years ago", she told her "she wished Mrs. Wilcox to have the acreage and at that time she spoke intelligently and in my judgment she knew what she was talking about then and her mind seemed clear that day; some days her mind was clearer than others and that was true up until about the date Mr. Williams died, and in 1948 there were days when Mrs. Williams seemed to be very clear; I do not remember the condition of Mrs. Williams on October 29, 1947, the day the deed, Ex. '4', was acknowledged before a notary public; I am not giving testimony as to her mental capacity on that date. That might have been one of her clear days and she might have fully understood and comprehended what she did on that date."

Mr. Snedden testified that they had lived at 3134 Cottage Grove Avenue since 1922 and were in each other's homes:

"I observed Mrs. Williams in the year 1947, and from my observations she had peculiar mannerisms as far as I was concerned then. In 1947 I was over there one evening and I spoke to her and she didn't say anything and Mr. Williams and I were talking and pretty soon she got up and says: 'Ain't you going to give me an introduction to this man?' I think this was in the fall of 1947. * * * the last fifteen years we visited quite often. In 1947 she didn't act herself like she used to. I know she has been bad for several years. Mr. Williams told me four or five years ago that Cora was slipping and her eyes were getting bad and her memory was getting bad too; I did not see her read in 1947 and Mr. Williams sat on the porch and read to her. He told me that he read everything out of the paper to her * * * and I observed that he read the paper to her up to the time of his death. * * * When things commenced to get high in 1941 she would say: 'If things get much higher, we will have to go to the poor farm.' "

Mrs. Wilcox was apparently the only one of the relatives of

her ward who maintained continuous relations with Mr. and Mrs. Williams. Their relations were apparently at all times friendly. They corresponded with and visited each other. It was clearly the desire and intention of both Mr. and Mrs. Williams that Mrs. Wilcox should have the acreage. That intention was manifested by the execution of the deed of that property to Mrs. Wilcox on the very day the deed involved herein was executed.

She testified that her condition was "markedly for the worse" in later years and that she did not know Mrs. Wilcox in 1946, and that she was senile.

The family physician, who made no claim to being a psychiatrist, observed her some in attending Mr. Williams, but made no general examination of her. His information about her prior to the last illness of her husband came from the latter, who said she had to be cared for like a child and he was concerned that he would precede her in death. The doctor declined to give an opinion about her mentality prior to the time he saw her in the rest home, when he said she was "mentally and nervously abnormal."

On cross-examination the doctor was shown the signature of Mrs. Williams in 1924 on the deed in question (October 29, 1947) and on her petition for guardianship of November 19, 1948. A summation of the extended examination of the doctor was that the signature of 1924 was that of a steady hand, but "in my opinion there is evidence in this signature on the 29th day of October, 1947 of which I might call senility or feebleness, but a great deal more evidence of that in this signature on the 19th of November, 1948. A great deal more evidence there. * * * In other words, the signature on November 19, 1948, as compared with the signature of October 29, 1947, shows there has been a great acceleration of the disability or degeneration between those two dates. A marked deterioration. These signatures in October of 1947 would indicate to me that the degenerative processes were not sufficiently advanced to interfere greatly with handwriting. Q. And if they had not sufficiently advanced to interfere with handwriting, they had not sufficiently advanced to cause an upset of mental equilibrium? A. I am afraid we don't have enough basis for a general statement like that, but we could

reason from the fact that the handwriting was not affected we could expect some mental normalness from this person. I do not purport to be a handwriting expert; I have never studied handwriting in connection with general arteriosclerosis of persons; no two cases of senile dementia or sclerotic condition of the brain are exactly the same. Degenerative processes could be more rapid in one case or more slow in another case; I never examined Mrs. Williams in connection with her handwriting; this is the first I have observed her handwriting, here in Court."

Many writers may doubt the reliability of handwriting as a test of senile dementia. The signature of Mrs. Williams on the two deeds signed by her on October 29, 1947, and on the mortgage on the home, signed and acknowledged by her on November 14, 1924, are each clear, legible, and well-written, and we see nothing in their appearance to distinguish them except that the last one was apparently made with a pen having a sharper point. Mr. Tyler, the notary public, was a witness for defendants. Both deeds had been acknowledged before him on the same day. Speaking of the deed to the home, he said:

"Mrs. Williams walked in by herself without assistance and Mr. Williams followed her. I typed out the deed 'Exhibit 4' (3211 Cottage Grove Avenue Homestead) but I don't think it was on the same day that they signed the deed. I think as I recall it Mrs. Williams asked me to make up the deed, and I think it was several days before they came down. Q. (Mr. Carlson) Will you tell us in your judgment whether at that time Cora May Williams or Cora M. Williams, the same person, was competent and able and comprehended and understood what she was doing? A. I think she did, without any doubt. Q. Tell us whether or not she appeared mentally competent? A. She did. Q. Did you have any conversation with them prior to her signature? A. Just what I said to Mrs. Williams, that I hadn't seen her for a long time, and she said, 'Well, I haven't been feeling very well, and haven't been able to go down to the bank.' And we talked along and I never noticed anything wrong whatever. * * * Yes, I had ample opportunity to observe that the two persons who signed the deeds were competent at that time."

Attorney George M. Faul, in whose office the petition for vol-

untary guardianship was prepared, and before whom Mrs. Williams signed it under oath, on November 19, 1948, as a witness for the defendants, testified:

"I saw her sign her name and it was out in West Des Moines at a nursing home. * * * ·We told her this was the application for guardian. * * * She made a remark that she couldn't get around very well and needed somebody to look after her property and she signed the petition very laboriously, and in my opinion she understood that she was signing a voluntary application for the appointment of a guardian."

Mrs. Alta E. Baldwin, a witness for defendants, testified that she had been in charge of the safe-deposit-box department of the Central National Bank of Des Moines for twenty years and knew both Mr. and Mrs. Williams in connection therewith. She recalled seeing Mrs. Williams on July 1, 1947, when she called at the bank for entree to her box. Exhibit 8, a slip evidencing the call bearing that date with her well-written signature on it, is in evidence. The witness said that Mrs. Williams at that time appeared mentally competent and was so dealt with. She testified that on August 3, 1948, Mrs. Williams telephoned her that she would like to have some business transacted from her box, but was unable to come down and wished to know what she should do, and she (Mrs. Baldwin) told her to sign a letter to that effect, and the same day such a note was produced by Mr. Williams signed by Mrs. Williams by "Her mark X."

It is our conclusion that, without regard to whether the plaintiff or the defendants had the burden of proving the validity of the deed which plaintiff seeks to cancel, the evidence clearly establishes that the execution and delivery of this deed was the voluntary act of Cora May Williams, and that she had the mental soundness and capacity to do so. The death of Mr. Williams and the mental incapacity of Mrs. Williams deprived the parties and the trial court of the benefit of their testimony. But the surrounding circumstances and the testimony as a whole, the exhibits, and particularly the testimony of Mr. Tyler, an intelligent and experienced businessman, who knew Mr. and Mrs. Williams well for many years and talked with and observed Mrs. Williams

480

when she signed and acknowledged the execution of the deed, convinced this court that the record below amply sustains the findings and judgment of the trial court. The record shows that even in the later years when Mrs. Williams was failing physically and mentally, there were many times when her mind was clear in 1947 and in 1948 after the deed was executed. Her failing eyesight prevented her from reading, but the fact that Mr. Williams read the newspapers to her until his death indicates that her mind was functioning and that she was interested in current events. There is no evidence of any improper advantage having been taken of her trust and confidence, or of undue influence used upon her, by Mr. Williams. His will amply provided for her care, and she had substantial assets of her own at his death. The matter of leaving the property of Mr. Williams to the State University for a very worthy cause, it may be fairly assumed, was a matter many times discussed by them, and also the necessity for disposing of their property before it was too late.

It is our conclusion that the judgment of the district court should be and it is—Affirmed.

All JUSTICES concur except MANTZ, J., not sitting.