# IN THE SUPREME COURT OF IOWA

No. 22–1905

Submitted April 11, 2024—Filed May 17, 2024

**CONSERVATORSHIP OF JANICE GEERDES** by **LAURA JENKINS,** Conservator,

Appellee,

vs.

**ALBERT GOMEZ CRUZ,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Kossuth County, Don E. Courtney, Judge.

A grantee seeks further review of a court of appeals decision affirming a district court judgment setting aside a quitclaim deed based on undue influence and the grantor's lack of capacity. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED.**

Mansfield, J., delivered the opinion of the court, in which all justices joined.

Shaun A. Thompson (argued) of Newman, Thompson & Gray PC, Forest City, for appellant.

Kevin R. Sander (argued) of Fitzgibbons Law Firm, L.L.C., Estherville, for appellee.

**MANSFIELD, Justice.**

**I. Introduction.**

> Lady, you know no rules of charity, [w]hich renders good for bad, blessings for curses.

William Shakespeare, *Richard III* act 1, sc. 2, ll. 72–73. Under Iowa law, individuals are generally allowed to dispose of their property as they see fit. But what does the law demand when someone whose mental acuity seems to be declining makes a substantial gift to an individual close to them?

In this case, an elderly woman and her long-time friend raised hogs in a partnership. Initially, the woman deeded half of her interest in the land to her friend. Over a decade later, she deeded the rest of her interest in the land to the friend, for nothing in return. About six months later, the woman's adult daughters were appointed her conservator and her guardian.

The conservator challenged the validity of the quitclaim deed based on undue influence and lack of capacity. After a bench trial, the district court set the deed aside. It found that there was undue influence through a confidential relationship and even if not, the woman lacked the necessary capacity to deed her interest in the land. A divided panel of the court of appeals affirmed on the basis of lack of capacity.

We granted the friend's application for further review to clarify the extent to which Iowa law permits donors to make their own decisions, even when an outsider—such as an audience member watching *Richard III*—may view the appeal to their sense of charity as misplaced. Based on our examination of the record and Iowa caselaw, we find that the conservator did not establish by clear, convincing, and satisfactory evidence that there was undue influence or that the woman lacked capacity at the time of the gift. In our view, the district court and the court of appeals gave too much weight to the perceived improvidence of the

transaction and too little weight to the testimony of the third-party accountant who witnessed the transaction. Therefore, we vacate the decision of the court of appeals, reverse the district court judgment, and remand for further proceedings.

## II. Facts and Procedural Background.

**A. Janice Geerdes and Albert Cruz.** This action is brought by Laura Jenkins, the adult daughter and conservator of Janice Geerdes.

For years, Janice was married to Marlin Geerdes, who farmed in Kossuth County. They had six children, including Laura. In 1999, Marlin passed away. At the time, Janice was sixty years old. Thereafter, Janice lived on her own in Swea City. She was supported by the rental income from two farm properties consisting of approximately 150 and 80 acres, respectively.

The defendant, Albert Cruz, grew up in the southwestern United States. He came to Iowa to work on a seasonal crew. He detasseled corn for a seed company and did other fieldwork. He got to know Janice and Marlin in the early 1990s because he rented a house from them. Albert, Janice, and Marlin became close friends. In 1995, Albert brought his family north from Texas and started living in Iowa full time. Albert does not read or write very well. When asked at trial how well he can read, he answered, "Hardly nothing." He was taken out of school as a young child because he "had to work."

After Marlin died in 1999, Albert continued to spend time with Janice and helped her with errands. During these trips, Janice would also cover Albert's expenses, such as food and gas. For a couple of years, they drove a truck together for hire. One witness said that Janice and Albert were together four days a week.

**B. The Formation of Blue Acres Pork in 2004.** In 2004, Janice and Albert agreed to raise hogs in a partnership. Janice deeded 9.64 acres of her land to herself and Albert as tenants in common. They also formed a partnership

known as Blue Acres Pork, which took out a substantial loan. Albert did not contribute any funds to the venture, but originally the plan was for him to provide the labor for the hog-raising operation. After six months, plans changed, and ever since then, Janice and Albert have contracted with a third party that is responsible for the hog operation. After payment of debt and other expenses, the hog site nets around $400 to $450 a month for Blue Acres Pork.

Laura lives only a few miles away from Janice, but did not learn of the hog partnership until 2008.

Another daughter of Janice and Marlin—Joy—lives in Swea City. Joy's home is in close proximity to Janice's, and she would see Janice almost every day. She described Janice as a "sugar momma" to Albert. Janice would write checks to him when he needed money. Albert contends, however, that often these payments occurred because Janice received the funds from the hog partnership and was giving him his share.[1]

Charles Laubenthal rented farmland from Janice, whom he described as "[p]retty hands-on." Janice asked him for advice when she started the hog site in 2004.

**C. Later Developments.** In 2016, Janice sold her eighty-acre parcel of farmland on an installment contract because she needed more income. Laubenthal had been renting that land and visited Janice "many times" about that sale. Albert was sometimes part of these discussions. Laubenthal felt that Albert didn't want him "in the picture" because he viewed Laubenthal as a

---

[1]There was testimony that Janice bought a power washer and trailer for Albert for about $10,000. Later, she wrote out a note that the power washer "has been paid off complete[ly]" as of September 2015.

"competitor." Laubenthal, however, continues to rent the portion of the 150 acres that is not in CRP.[2]

Around that time, Albert got divorced and moved into a small building on the hog site that was formerly an office. In 2018, Albert's teenage daughter moved in as well. Albert had been working in trucking but at the time of trial was unemployed.

Janice's financial position has been precarious despite her ongoing ownership of the remaining farmland. She owes money to the IRS.

**D. Cognitive Assessments and the Accident.** In April 2017, Janice underwent an assessment of her level of cognitive function by an occupational therapist using the Saint Louis University Mental Status Examination (SLUMS) and the Revised Allen Cognitive Performance Test (CPT). She scored 19 out of 30 possible points on the SLUMS. According to the report, "[a] score of 1-20 denotes dementia for a person with a high school education." Janice also scored 33/39 on the Allen CPT. This was described as "denot[ing] mild cognitive-function disability; with deficits in working memory. Problems may be observed with recent memory, judgment, reasoning, and planning ahead."

In October of that year, Albert was driving Janice when he had a car accident. Janice was injured and hospitalized for a period of time. During that time, Albert was seen taking her checks to sign that were made out to him as payee. Upon Janice's release from the hospital, she went through rehabilitation at a nursing home for several months before returning home.

---

[2]"CRP is a land conservation program administered by the Farm Service Agency (FSA). In exchange for a yearly rental payment, farmers enrolled in the program agree to remove environmentally sensitive land from agricultural production and plant species that will improve environmental health and quality." *Conservation Reserve Program*, Farm Serv. Agency, U.S. Dep't of Agric. https://www.fsa.usda.gov/programs-and-services/conservation-programs/conservation-reserve-program/index#:~:text=CRP%20is%20a%20land%20conservation,improve%20environmental%20health%20and%20quality [https://perma.cc/ZX2Y-W6QH].

In January 2018, Janice (now seventy-eight years old) again underwent an assessment for cognitive deficits with an occupational therapist. According to the report, she scored 19 out of 30 points again on the SLUMS. She scored 34.5/39 on the Allen CPT, which "denotes mild cognitive-function disability; with deficits in working memory." In summary, the assessment concluded,

> Patient's performance on the SLUMS indicates dementia and the need for further assessment. Patient's performance on the Allen CPT denotes that this woman needs frequent check-in support and assistance with instrumental activities of daily living. She should receive assistance with bill paying, managing finances, setting up her medications, and making appointments in which her family currently acknowledges and completes.

**E. The Quitclaim Deed.** In January 2019, Janice executed a quitclaim deed transferring her interest in the 9.64-acre hog site to Albert for no consideration. Laura did not become aware of the transaction until a month or two later when she was helping Janice with her finances. According to Laura, she told Janice that she had "signed the second half of the land over to Albert," and Janice responded, "[N]o, that's not what I wanted." Laura claims that Janice did not recall the transaction.

Gayle Lemmon is an accountant in Humboldt. For years, she had done the taxes for Janice, Albert, and Blue Acres Pork and, more recently, certain financial recordkeeping for Blue Acres Pork. According to Lemmon, Janice and Albert came into her office in January to discuss the preparation of a quitclaim deed to transfer the property to Albert. Janice did most of the talking during the meeting and seemed to be driving the decision. Lemmon recalled that Janice was able to draw out the boundaries of the hog site on an aerial photograph. Lemmon wasn't comfortable preparing a deed and sent them to an attorney for that task. After Janice and Albert returned from the attorney with a deed, Lemmon witnessed

and notarized Janice's signature. Lemmon recalled Janice saying that "she wanted to make sure that Albert had gotten his share of the property."

Lemmon also recalled that Janice's children did not get along with Albert. She said that Janice had explained they did not like him. And she reported that Janice had given her a copy of a handwritten note that said, "[W]hat I help Albert Cruz is nobody['s] concern. Janice Geerdes."[3]

In July 2019, Laura filed a petition and was appointed conservator for Janice. The following month, Janice moved to Kansas where she began to live with another daughter, Peggy Redmon, who was appointed guardian. According to Peggy, when Janice arrived in Kansas, she could not use a calculator to add numbers and was not interested in bathing herself. By the time of trial Janice was having hallucinations—i.e., seeing things that weren't there. Peggy testified that Janice had told her years ago that "it's a lot easier to do what Albert tells her to do than to have him get mad."

**F. This Action.** In May 2020, Laura brought suit in the Kossuth County District Court to set aside the January 2019 quitclaim deed. She alleged both undue influence and lack of capacity. Following a bench trial, the district court ruled for Laura on both grounds. It found that a confidential relationship between Albert and Laura existed, raising a presumption of undue influence. The district court went on to conclude that Albert had not negated the presumption by clear, satisfactory, and convincing evidence. Alternatively, the district court found that Janice lacked the requisite mental capacity in January 2019 to quitclaim her interest in the property to Albert.

---

[3]Lemmon testified that her impression of the note was as follows: "I would say that she gave it to me mainly because she wanted me to have proof of everything in case there was a problem between Albert and her children."

Albert appealed, and we transferred the case to the court of appeals. A divided panel of the court of appeals affirmed on the basis of lack of capacity. We granted Albert's application for further review.

### III. Standard of Review.

The parties agree that this case was tried in equity and is subject to de novo review. *See Jackson v. Schrader,* 676 N.W.2d 599, 603 (Iowa 2003). In equity cases, especially considering the credibility of witnesses, we give weight to the fact-findings of the district court but are not bound by them. Iowa R. App. P. 6.904(3)(*g*); *see also Jackson,* 676 N.W.2d at 603.

"Proof of undue influence must be by evidence that is clear, convincing, and satisfactory. Evidence is clear, convincing, and satisfactory when there is no serious or substantial uncertainty about the conclusion to be drawn from it." *Mendenhall v. Judy*, 671 N.W.2d 452, 454 (Iowa 2003) (citation omitted).

### IV. Legal Analysis.

On further review, we have the blessing—or burden—of two sharply divergent opinions from the court of appeals. Both are well-written and insightful, but they differ in their analysis and conclusions. We agree with the court of appeals majority that this is a "close case." We also agree with the court of appeals dissent that this case has a "thin record."[4] We will first turn to undue influence and then to the question of mental capacity.

**A. Undue Influence.** We have said that "[f]our elements are necessary to establish undue influence." *Id.* They are:

> (1) The [grantor] must be susceptible to undue influence,
> (2) opportunity [on the part of the grantee] to exercise such influence
> and effect the wrongful purpose must exist, (3) a disposition [on the

---

[4]For example, although Laura had access to Janice's financial records, she presented no documentary evidence of Janice's cash flow and spending, what happened to the proceeds from the 2016 sale of eighty acres of farmland, and what Albert received from Janice.

part of the grantee] to influence unduly for the purpose of procuring an improper favor must be present, and (4) the result must clearly appear to be the effect of undue influence.

*Id.* (alterations in original) (quoting *Helgeson v. Henderson* (*In re Est. of Herm*), 284 N.W.2d 191, 201 (Iowa 1979)). "Weakened mental condition of the grantor, relationship of the grantor and the grantee, inequality of distribution, and activity of the grantee are all factors that bear on the question of undue influence." *Id.*

1. *The record here does not establish a confidential relationship or undue influence.* The district court held that Janice and Albert stood in a "confidential relationship." If a confidential or fiduciary relationship exists between the grantee and the grantor, "the burden of proof shifts to the grantee to negate a presumption of undue influence by clear, convincing, and satisfactory evidence." *Id.* at 454–55. A confidential relationship "embraces those multiform positions in life wherein one comes to rely on and trust another in his important affairs." *Id.* at 455 (quoting *Helgeson*, 284 N.W.2d at 199). It "arises whenever a continuous trust is reposed by one person in the skill and integrity of another." *Id.* (quoting *Helgeson*, 284 N.W.2d at 199).[5]

To rebut the presumption of undue influence arising from a confidential relationship, the grantee needs to "prove by clear, satisfactory, and convincing evidence that the grantee acted in good faith throughout the transaction and the grantor acted freely, intelligently, and voluntarily." *Jackson*, 676 N.W.2d at 605.

The district court found that a confidential relationship existed between Albert and Janice based on the following facts:

> Albert had a friendly relationship with Janice and her husband since sometime in the 1990's. When her husband died

---

[5]Albert does not argue for any change in our existing legal standards. *See Est. of Workman v. Workman*, 903 N.W.2d 170, 172 (Iowa 2017) (declining to consider a change to the undue influence standard when the appellant had failed to preserve error).

> Albert and Janice were around each other often. He was always around and they would often go places and drove a semi-truck together for a while. They were in business together and entered into a partnership agreement establishing Blue Acres Pork becoming equal partners in raising hogs. She transferred a tract of land to both of them as tenants in common. Her medical records prior to the automobile accident in January, 2017 exhibited mild cognitive impairment with deficits in working memory. Problems were observed with memory, judgment, reasoning, and planning. Her record indicates underlying dementia. Likewise, her medical records reflect dementia after the accident, all before execution of the Quit Claim Deed dated January 9, 2019. Laura observed that Janice was paying for things for Albert including food and gas. She also wrote a check to Menards at Albert's instruction and for Albert's benefit that came back with non-sufficient funds. Laura arranged to have some of the merchandise returned and paid restitution on the remainder of the funds due. Janice trusted what Albert told her to do as he instructed her to write some checks while she was in the hospital.

We accept these findings except for the conclusion that "Janice trusted what Albert told her to do." On our review, we disagree because it is clear that Janice took advice from several quarters—from her daughters, from Albert, and from Laubenthal. Janice was generous to Albert over the years; an outsider might say generous to a fault. But the record indicates that Janice *wanted* to be generous to Albert. As she put in writing, "[W]hat I help Albert Cruz is nobody['s] concern." Janice understood that the checks she wrote him were for his benefit, not hers.

The remaining facts cited by the district court cover a variety of time periods and in our view are insufficient to establish a confidential relationship. Some other points should be noted. Albert had no formal education and could not read or write well. Albert wasn't a family member, and he lived apart from Janice, together with his teenage daughter. He didn't handle Janice's finances; either Janice or Laura did. He didn't do the books for the partnership; either Janice or Lemmon did. Thus, taken as a whole the proof presented at trial falls short of demonstrating by clear and convincing evidence that Janice continuously relied on and trusted Albert. *See Mendenhall,* 671 N.W.2d at 454.

Setting aside the question of whether there was a confidential relationship, the record does not demonstrate by clear and convincing evidence that Albert procured the gift by undue influence. The direct evidence from Lemmon indicates that Albert did the driving but Janice did the talking in January 2019. According to Lemmon, Janice appeared to be the person mainly behind the decision to do the quitclaim deed. She drew out the boundaries of the hog site herself on an aerial photograph. The gift was part of a pattern of previous gifts to Albert. We cannot say that the result "clearly appear[s] to be the effect of undue influence." *Id.* (quoting *Helgeson*, 284 N.W.2d at 201); *see also id.* ("Undue influence must be present at the very time the transfer is made.").

2. *In analogous cases, we have found no confidential relationship or undue influence.* Prior undue influence cases involving inter vivos gifts provide guidance here. Some time ago, we emphasized that the confidential relationship "should be clearly established"—rather than inferred or presumed. *Stephenson v. Stephenson*, 74 N.W.2d 679, 684 (Iowa 1956). "Otherwise it might become a weapon to thwart the will of the one whose interest it is designed to protect." *Id.* In *Stephenson v. Stephenson*, we reiterated a longstanding rule that "[m]ere blood relationship does not of itself create the legal trust or confidential relationship and change the burden of proof which rests upon the parties asserting such undue influence." *Id.* (collecting earlier cases). We declined there to find a confidential relationship between two children and their terminally ill father:

> We have said many times that transactions between an aged and infirm parent *who has reposed confidence and trust* in the child will be closely scanned by the court, and when those facts appear the burden is on the grantee to show the bona fides thereof. In the case at bar the defendants did the household chores, cared for their father in his sick bed and ran errands, but there is nothing which even hints that by performing these menial tasks they gained any dominance or control over their father.

*Id.* at 685 (citations omitted).

Likewise, in *Groves v. Groves*, we found that a confidential relationship did not exist between a son and his eighty-six-year-old mother such as to warrant setting aside her gift of farmland to him. 82 N.W.2d 124, 126, 131 (Iowa 1957). We cataloged facts that were not sufficient to establish such a relationship: "a close family relationship," the fact that the son was "almost a daily visitor in plaintiff's home and did many errands for her," and testimony that the son "was plaintiff's adviser is of little weight in the absence of evidence of facts bearing out these assertions." *Id.* at 131. We observed that a confidential relationship exists "when one person has gained the confidence of another and purports to act or advise with the other's interest in mind." *Id.*

In sum, Iowa decisions have repeatedly emphasized that family and personal ties are not enough to create a confidential relationship in this context; one person must have trusted the other to handle their affairs. *See Else v. Fremont Methodist Church*, 73 N.W.2d 50, 57–58 (Iowa 1955) (reversing the district court because it inferred a confidential relationship from "the religious nature of the relationship" even though the defendants had "handled no business matters" for the plaintiff's wards and there was no showing that the wards had "reposed any special faith and confidence" in the defendants); *Menary v. Whitney*, 56 N.W.2d 70, 76 (Iowa 1952) (holding that the district court erred in finding a confidential relationship between wife and husband so as to shift the burden of proving undue influence); *Wilson v. Wilson*, 34 N.W.2d 911, 915 (Iowa 1948) ("It is true defendant's father was associated with decedent in the insurance business but there is no such showing as to establish the existence of confidential relationship, or of such dependence of decedent upon his son and grandson as to cast on them the burden of disproving undue influence."); *Hindman v. Hindman*, 988 N.W.2d 420, 430 (Iowa Ct. App. 2022) (finding no

confidential relationship between a husband and a wife in light of the fact that "no one at the closing testified there was any indication that [the wife] was unaware or incapable of understanding the details of the transfer"); *Clark v. Swope* (*In re Est. of Clark*), 357 N.W.2d 34, 37–38 (Iowa Ct. App. 1984) (holding that a son was not in a confidential relationship with his father and noting that "[t]he purpose of the doctrine is to defeat and correct betrayals of trust and abuses of confidence").

As we summed up in a case where we declined to find a confidential relationship between a wife and her husband, "There is no showing that anyone had taken over [the husband's] affairs in such a sense as to constitute a confidential relationship." *Klein v. Klein*, 29 N.W.2d 163, 169 (Iowa 1947) (quoting *Arndt v. Lapel*, 243 N.W. 605, 609 (Iowa 1932)). Applying that standard here, Albert didn't take over Janice's affairs. The record indicates that she made gifts to him because she wanted to reward him not because she placed her trust and confidence in him.

3. *Cases finding a confidential relationship or undue influence are distinguishable.* In *Mendenhall v. Judy*, we upheld a district court's order setting aside a mother's gratuitous transfer of stock in a family corporation to one daughter. 671 N.W.2d at 454. The mother's will would have left that property to her daughter and her two sons. *Id.* at 456. Additionally, she had previously made known her desire for an equal division. *Id.* But the daughter lived in the same town as the mother, called on her five or six times a day, and had a power of attorney from the mother. *Id.* The daughter "either personally took care of or saw that [the mother's] daily physical needs were met." *Id.* at 460. A "very close, loving" relationship emerged. *Id.* Then, the daughter hired an attorney to arrange for the gift of the stock to her. *Id.* at 457. The sons were informed after the gift document had been executed. *Id.* Further, the mother "had the notion that if she

transferred the stock to [the daughter], [the daughter] would keep her out of a nursing home. [The daughter] knew this, and we are satisfied she used this knowledge to her advantage to convince [the mother] to transfer the stock to her." *Id.* at 463. We approved the finding of a confidential relationship, while also sustaining the district court's separate finding that undue influence had occurred even without the benefit of a presumption based on the presence of a confidential relationship. *Id.* at 460.

Here, by contrast, Albert wasn't a family member and, although he ran errands and spent a lot of time with Janice, he wasn't a daily caretaker for her. He didn't occupy a fiduciary position. Although Lemmon testified that Albert took care of things for Janice and that she came to view him "kind of like a son," there was a limit to his role. And there is nothing in the record indicating that Albert made representations or commitments to her to induce the transfer of her interest in the hog site to him. There is also no evidence that Janice had another plan for the hog site that Albert caused her to alter. For example, none of the daughters testified that Janice had promised them her interest in the hog site. We acknowledge that "[d]irect proof of undue influence is not required. In fact, undue influence may be and usually is proven by circumstantial evidence." *Id.* at 454. But where the direct evidence from the accountant Lemmon tended to negate the existence of undue influence, more was needed, and the trial record doesn't provide it.

Generally, we have found a confidential relationship in an action to set aside an inter vivos gift on the basis of undue influence when the donee managed the donor's affairs and the donor believed the donee was acting in the donor's interest—not their own. Thus, in *Palmer v. James* (*In re Estate of Baessler*), a father-daughter confidential relationship was established where the daughter "decided to move her father in with her rather than placing him in a nursing

home" and "was involved in the daily conduct of [the father's] life and financial affairs." 561 N.W.2d 88, 91 (Iowa Ct. App. 1997), *abrogated on other grounds by Jackson*, 676 N.W.2d 599.

And in *Helgeson v. Henderson* (*In re Estate of Herm*), we found that the confidential relationship existed "at least on and following the date of execution of the power of attorney" in favor of the decedent's nephew. 284 N.W.2d at 200. The nephew had arranged for the signing when his aunt was "helpless, bedridden, incontinent with respect to her kidneys and bowels, unable to walk, falling asleep almost involuntarily, and '[h]er level of conscious awareness was almost zero.' " *Id.* at 194 (alteration in original). Following the signing, the nephew arranged various transfers of assets in his favor. *Id.* at 195. The witnesses to the signing "were never called to testify in [the] litigation." *Id.*

Similarly, in *First National Bank in Sioux City v. Curran*, we upheld the district court's finding of a confidential relationship in another situation where the donee had taken over the donor's affairs. 206 N.W.2d 317, 319, 322 (Iowa 1973) (en banc). The donee had become acquainted with the donor when the donor was already ninety years old and in a geriatric ward. *Id.* at 319. The donee handled the donor's financial affairs completely and "even had possession at her home of [the donor's] financial records." *Id.* at 320. The transfers were signed when the donor was ninety-six or ninety-seven years at the geriatric ward in the presence of the recipient and her husband. *Id.*

In *Jeager v. Elliott*, we concluded that a confidential relationship existed between a niece and her husband and an aunt in her mid-eighties who "was failing mentally as well as physically" given that the niece and her husband "took care of [the aunt's] business." 134 N.W.2d 560, 563–65 (Iowa 1965). The aunt "had no independent advice." *Id.* at 566. In *Luse v. Grenko,* the mother moved in

with the daughter who handled her financial transactions. 100 N.W.2d 170, 173 (Iowa 1959). As we put it:

> It seems quite clear decedent because of her inability to read, write or speak the English language, her age and failing health was unable to transact business for herself. Naturally she turned to defendant and depended upon her to do it for her. Defendant had gained her mother's confidence and purported to act with the latter's interest in mind.

*Id.* at 174; *see also Woolwine v. Bryant*, 54 N.W.2d 759, 760 (Iowa 1952) (finding a confidential relationship where the donee handled the donor's finances and "[s]he was the only one [he] had to depend on"); *Lundvall v. Charbonneau* (*In re Lundvall's Est.*), 46 N.W.2d 535, 537 (Iowa 1951) (deciding that a married couple were in a confidential relationship where the husband "suffered a head injury . . . [making him] less able to look after his business affairs," and the wife changed the information on his bank accounts and made his bonds payable to herself upon his death); *Curtis v. Armagast*, 138 N.W. 873, 880 (Iowa 1912) (finding a confidential relationship where the grantee was the grantor's son and "[h]e was her agent, and for nearly [twenty] years had been intrusted by her with the management of the[] lands comprising practically all her worldly estate" whereas she "put implicit trust and confidence in his ability and his purpose to do whatever was right with respect to her property and property interests").

Again, none of those cases, each of which involves a donee who had taken over the donor's business or financial affairs, describes the present situation. The record does not establish by clear, convincing, and satisfactory evidence that there was a confidential relationship. Notably, under our caselaw, proof of a confidential relationship often seems to involve proof that the donee was "the dominant person" and the donor was "the subservient one." *Luse*, 100 N.W.2d at 172. Otherwise stated, to prove a confidential relationship in order to shift the burden for undue influence purposes, one has to prove that the grantee was

already a dominating influence on the grantor. In a sense, we have folded the undue-influence inquiry into the confidential-relationship inquiry. *See, e.g., Peoples Bank & Tr. Co. of Cedar Rapids v. Lala*, 392 N.W.2d 179, 185–86 (Iowa Ct. App. 1986) ("The gist of the doctrine of confidential relationship, therefore, is *the presence of a dominant influence* under which the act is presumed to have been done.").

Cases where our courts have found undue influence without a confidential relationship are also distinguishable. For example, in *Fisher v. Estate of Welch* (*In re Estate of Welch*), the court of appeals passed over the issue of confidential relationship and found that the wife had unduly influenced her husband. 534 N.W.2d 109, 112 (Iowa Ct. App. 1995) (en banc). There, a man had suffered a "crippling heart attack," could not drive and "could not live alone," "suffered from severe depression and was suicidal," and "was also an alcoholic." *Id.* He relied on his wife (whom he had just married) "for transportation, to remind him to take his medicine, for care when he had angina attacks, and for emotional support." *Id.* He "became isolated from his family and medical assistance." *Id.* During the brief eight-month marriage before the husband died, he transferred "over $330,000 of assets, annuities, and insurance" to his wife. *Id.* at 111.

Those aren't the facts here. Albert was neither a newcomer in Janice's life nor was he her only link to the outside world. Rather, he simply maintained the close friendship with Janice that he had always had. Janice did the talking at the key 2019 meeting with Lemmon.

Admittedly, some aspects of the present case are troubling. Because of her weakened physical and mental condition, Janice was susceptible to improper influence. Albert had urged Janice to sell the eighty acres in 2016, which she did, although Janice also received advice from Laubenthal on that transaction. Also, the typical pattern is for the surviving spouse of a couple that had farmed

to favor family members in disposing of any farm-related real estate. But Janice and Albert had been involved in the hog site together for the last fifteen years, and she had previously donated his original half-share to him. The conveyance of the remaining half still left Janice with 150 acres of farmland. Notably, none of her children farmed. While the record displays a pattern of Albert asking for money and Janice responding by giving him money, the record also indicates that it was Janice's choice to engage in this ongoing practice. *See Jackson*, 676 N.W.2d at 605 (placing weight on the donor's past donative practices in finding no undue influence as to certain transactions).

For the foregoing reasons, we find that the record fails to establish a confidential relationship by clear, convincing, and satisfactory evidence and fails to establish that Albert exercised undue influence with respect to the execution of the January 2019 deed.

**B. Mental Capacity.** "A party alleging a grantor's insufficiency of mental capacity to execute a deed carries the burden of proving by clear, convincing, and satisfactory evidence that the grantor failed to 'possess "sufficient consciousness or mentality . . . to understand the import of her acts" when the deed was executed.' " *Todd v. Todd* (*In re Est. of Todd*), 585 N.W.2d 273, 276 (Iowa 1998) (omission in original) (quoting *Daughton v. Parson*, 423 N.W.2d 894, 896 (Iowa Ct. App. 1988)). We have said,

> [T]he burden is upon the plaintiffs to establish by clear, satisfactory and convincing testimony that the grantor, at the time he executed it, did not understand in any reasonable manner the nature of the particular transaction in which he was engaged and the consequences and effects upon his rights and interests.

*Stephenson*, 74 N.W.2d at 681. "The courts have uniformly upheld the right of every person to dispose of his property freely and in accordance with his wishes, and have refused to permit such right to be disturbed without strong proof." *Id.*

The district court reasoned that

> [Janice's] medical records indicated as early as 2017 that she had dementia. The dementia in combination with her age and physical health, the lack of consideration, and the improvident nature of the transaction given that she retained the debt on the property convinces this court that from the entire record there is clear, convincing, and satisfactory evidence that the grantor, Janice, did not possess sufficient consciousness or mentality to understand the import of her acts when the deed was executed.

In short, the district court zeroed in on Janice's cognitive assessments and "the improvident nature of the transaction." As before, we accept the district court's findings on these particular points, but as applied to this case they do not establish a lack of mental capacity by clear, convincing, and satisfactory evidence as of the time Janice executed the deed.

The ultimate question is what Janice understood when she signed the deed. *See Todd*, 585 N.W.2d at 276. Lemmon's testimony, taken as a whole, indicates that Janice was aware of what she was doing. According to Lemmon:

> Q. And what was it exactly that Janice was asking you to do?
>
> A. She wanted me to do a quit claim deed for her to transfer the property over to Albert.

Lemmon added that Janice "even drew out the description of it and where she wanted the lines to go on an aerial photograph." Lemmon further testified that Janice understood she had children and that they would be the people who would naturally inherit her estate. Lemmon also testified that Janice appeared "to be in a similar mindset" in regard to her decision-making capability as she had possessed in prior encounters. *See Oehler v. Hoffman*, 113 N.W.2d 254, 260 (Iowa 1962) (upholding a deed executed four days before the grantor's death, despite a lack of capacity challenge, where the attorney who prepared the deed testified that the grantor "told him she wanted the property to go to the [grantees]").

The district court didn't discuss Lemmon's testimony in its conclusions of law. Nor did it question her credibility. Lemmon may not have been totally disinterested: anyone would have a natural tendency not to admit they facilitated a transaction where someone was taken advantage of. Still, Lemmon was less interested than the daughters and Albert. And their testimony was generally rather vague, especially as to time.

The district court seemingly concluded that the assessments and the folly of giving away this property outweighed other factors, principally Lemmon's testimony. Significantly for our review purposes, neither of the two matters the district court cited—the assessments and the terms of the transaction—involved witness credibility. The assessments were introduced only as documentary evidence, and the terms of the transaction were not disputed.

On our review, the assessments certainly raise a question about Janice's mental capacity, but they do not foreclose the possibility that she understood what she was doing at Lemmon's office in January 2019. As we have said,

> Mere mental weakness in a grantor will not invalidate a deed. To have that effect, the mental powers must be so far deteriorated or destroyed that the grantor is incapable of understanding in a reasonable degree the nature and consequences of the instrument he executes.

*Else,* 73 N.W.2d at 61–62 (quoting *Nowlen v. Nowlen,* 98 N.W. 383, 384 (Iowa 1904)).

Laura didn't develop the record in this area further, for example, by offering expert testimony that the assessments meant that Janice could not have comprehended what the deed meant or testimony from a treating physician that Janice was by then no longer competent in business matters. *Cf. Costello v. Costello,* 186 N.W.2d 651, 655 (Iowa 1971) ("[A]ttending physician, with prior experience in the field of psychiatry, voiced the factually substantiated expert

opinion, decedent was utterly incompetent and incapable of any understanding as to what she was signing or the nature of the controverted instruments executed by her."); *Charlson v. Brunsvold*, 89 N.W.2d 344, 348 (Iowa 1958) (finding a fact issue on mental capacity in light of, inter alia, attending physician's testimony that the donor "had no memory and was not capable of performing business or financial transactions"); *Daughton*, 423 N.W.2d at 897 (reversing a district court finding that the grantor had sufficient mental capacity to transfer her farmland by deed when, among other things, her attending physician "testified that her state of mind was such that she would not have had a reasonable perception of the nature and terms of the contract").

Our caselaw has instances where we found a donor with strong signs of dementia nonetheless possessed the mental capacity to make a gift. For example, in *Wilson v. Wilson*, the donor was described as dressing unusually, "using various parts of the house as a toilet, turning on gas jets, . . . getting lost in the neighborhood," failing to recognize people, being careless in handling money, and engaging in "peculiar conduct in many other ways." 34 N.W.2d at 912. His attending physician said that he "was becoming senile." *Id.* at 913. Yet the physician "freely admitted the possibility of subsequent sane or lucid intervals, though not of any permanent recovery." *Id.* at 914. And we noted, "The transaction itself is neither so incredible nor so unusual as to arouse wonder or suspicion." *Id.* In the end, we deferred to the findings of the district court, which had deferred to the testimony of those who were direct witnesses to the transaction. *Id.* at 914–15. They reported that the donor understood what he was doing that day. *Id.*

Likewise, in *Stephenson*, we determined that the testimony of the witnesses to the actual transaction—which the grantor approved with a nod of his head—was "almost conclusive" despite evidence that the grantor didn't

recognize people, a doctor found the grantor in a coma three days afterward, and another doctor who had examined the grantor five days beforehand noted that the grantor "[d]oes not seem to understand what is happening." 74 N.W.2d at 681–83. As we put it, "The crux of this case and the principal question for the court to decide was whether at the time of the execution of the deed grantor was shown to lack sufficient consciousness or mentality to understand the import of his acts." *Id.* at 681.

In *Wilcox v. Hamborg,* we upheld a deed executed by an eighty-one-year-old despite the testimony of several witnesses that her mental faculties had been declining. 46 N.W.2d 530, 530, 532–34 (Iowa 1951). In particular, the testimony of a businessperson who "knew [the grantor] well" and "talked with and observed [her] when she signed and acknowledged the execution of the deed, convinced this court that the record below amply sustains the findings and judgment of the trial court." *Id.* at 534.

As for the improvidence of the transaction, that is certainly a relevant consideration. *See Palmer,* 561 N.W.2d at 92 ("The Court is entitled to take into consideration [on the issue of mental capacity] . . . whether or not the conveyance was improvident . . . ." (alteration in original) (quoting *Daughton,* 423 N.W.2d at 896)). But we make a couple of observations. First, the improvidence can be overstated. Although Janice remained liable for the mortgage debt on the property (along with Albert), the record indicates that the hog site had been cash-flowing and netted a positive, if modest, sum while the mortgage was being paid down. Laura put on evidence to the general effect that Janice was in a tight financial position, but there were few specifics. Second, while the transaction may have been "unreasonable," that doesn't mean it was "unnatural." *Charlson,* 89 N.W.2d at 348 ("An unnatural and unreasonable disposition of property may be shown as bearing on the issue of mental condition." (quoting *Richmond v. First*

*Nat'l Bank of Pleasantville*, 179 N.W. 59, 61 (Iowa 1920))). Janice had a history of bestowing charity on Albert. Albert lived on the hog site, and Janice may have wanted him to continue to have that home after she were to pass on.

Again, this is a close case and there are facts weighing in favor of Laura and against Albert. According to Laura, Janice did not recall signing over the property to Albert when Laura confronted her mother just two months later. But this does not necessarily mean she lacked an understanding of the deed when she executed it. *See, e.g., Wilcox*, 46 N.W.2d at 534 ("The record shows that even in the later years when [the grantor] was failing physically and mentally, there were many times when her mind was clear . . . .").

We hold that the record fails to show by clear, convincing, and satisfactory evidence that Janice lacked the mental capacity to convey her interest in the hog site to Albert.

**V. Conclusion.**

For the foregoing reasons, we reverse the judgment concluding that the deed of January 9, 2019, should be set aside based on undue influence and lack of mental capacity, and we vacate the decision of the court of appeals. We remand to the district court for entry of judgment in favor of Albert and further proceedings consistent with this opinion.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED.**